**Gilbert LITTMAN, Plaintiff,**

v.

**FIRESTONE TIRE & RUBBER COMPANY, Defendant.**

No. 88 Civ. 3603 (MBM).

United States District Court,
S.D. New York.

March 30, 1989.

Marvin I. Edelstein, Floral Park, N.Y. for plaintiff.

Barry R. Satine, Jones, Day, Reavis & Pogue, New York City, C. Daniel Karnes, Glen D. Nager, Jill J. Beaver, Jones, Day, Reavis & Pogue, Washington, D.C., for defendant.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff, Gilbert Littman, claims that in discharging him defendant, Firestone Tire & Rubber Company ("Firestone"), discriminated against him on the basis of age in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* (1982) (ADEA) and on the basis of religion in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* (1982) (Title VII). Plaintiff also contends that he was fired because he threatened to expose alleged racketeering activities of certain unnamed officers or employees of Firestone, citing violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* (1982 & Supp. IV 1986) (RICO) and the Conscientious Employee Protection Act of New Jersey, N.J.Stat.Ann. § 34:19–1 *et seq.* (1988) (CEPA). Diversity jurisdiction is also pleaded for the state law claims.

Defendant now moves for summary judgment on all counts. For the reasons stated below, defendant's motion is granted on all counts except plaintiff's CEPA claim.

### I.

Firestone is an Ohio corporation that owns and operates retail stores across the country. Plaintiff applied in January 1983 for the position of real estate negotiator in Firestone's Real Estate Department. The post involved primarily scouting for promising sites for new Firestone stores, although plaintiff apparently also helped sell property Firestone no longer wanted. At the time he was hired, plaintiff was 61 years old. He travelled to Firestone's Ohio offices where he was interviewed and offered the job. He began working for Firestone on February 28, 1983. At all times during his employment, he worked out of Firestone's New Jersey offices, although his territory covered New York and Connecticut as well. (Littman Aff. at ¶ 12)

As a real estate negotiator, plaintiff was responsible for preparing and submitting to management new store investment proposals and competitive acquisition proposals and dispositions. (Daniels Aff. at ¶¶ 6, 7) Also, he had to submit a weekly itinerary, a monthly new store action report, and various other reports detailing his efforts to obtain new store sites for Firestone. (Daniels Aff. at ¶¶ 11, 12) Moreover, for each new store site that he proposed, plaintiff had to confer with the zone sales manager and obtain both a projection of sales volume at the store and the zone manager's approval. (Daniels Aff. at ¶¶ 5, 6) In addition, plaintiff had to prepare a complete site evaluation package, including demographic and census data, information on traffic patterns and zoning restrictions, maps of the area, a feasibility study, a purchase or lease agreement, copies of the deed and tax bill, and various other data or publications. (Daniels Aff. ¶ 6) Once it was prepared, plaintiff had to submit the complete package and proposal to Firestone management for approval and authorization. (Daniels Aff. at ¶ 7) Firestone required plaintiff, as it did all other employees, to meet an annual objective of a specific number of management-approved deals. (Daniels Aff. at ¶¶ 13, 15)

Plaintiff performed these responsibilities with mixed results during his first two and one-half years of employment. Although he was cited as the number one dealmaker in the first six months of 1985 (Littman Aff., Exh. A), he exhibited marked deficiencies: for example, he failed to file monthly new store action reports in a timely fashion and exhibited other erratic behavior. (Daniels Aff., Exh. A) Thus, when Joseph Daniels became regional real estate manager for the northeast region in 1986 and reviewed plaintiff's personnel file, he noted that plaintiff "had only six deals that were acceptable to, and approved by, Firestone's senior management, that Mr. Littman had difficulty managing his time efficiently, that Mr. Littman did not put new store development packages together properly, and that Mr. Littman frequently pursued sites in areas where the zone managers, his supervisors and upper management had in-dicated that they would *not* place a store." (Daniels Aff. at ¶ 5 (emphasis in original))

Plaintiff's job performance deteriorated during the last two years of his employment. (Daniels Aff. at ¶¶ 8–15) Plaintiff still failed to follow established procedures for preparing and submitting new store proposals. On July 15, 1986 K.J. Lind, Firestone's manager of design and construction, wrote a letter to plaintiff, with a copy to Daniels, complaining that plaintiff's preliminary site sketches were inadequate and that plaintiff had yet to send any information such as "set backs, easements, parking requirements, landscape requirements, number of bays desired, allowable drive locations, photos, etc. ... so we don't have to guess what you need." (Daniels Aff. at ¶ 8; Exh. B) On July 30, 1986, Daniel sent plaintiff a memorandum reiterating the requirements for a complete site package and how to meet them. (Daniels Aff. at ¶ 9) In late August 1986, G.C. Zeman, Vice President of the Real Estate Department, wrote Daniels complaining that plaintiff's site proposal for the Tom's River project in New Jersey failed to note that the town required a 100 foot set back and that "had we known of [the] requirement ... we never would have signed a lease." (Daniels Aff. at ¶ 10; Exh. D)

Daniels met with plaintiff on September 18, 1986 to discuss the mounting deficiencies in plaintiff's performance. Daniels drafted a list of the deficiencies discussed at the meeting, including, *inter alia*, problems with some of plaintiff's prospective sites and deals, his failure to submit weekly itineraries, and his failure to submit complete site packages. (Daniels Aff. at 11; Exh. E) Daniels also gave plaintiff his performance appraisal at that meeting, noting that plaintiff failed to meet his position requirements because of failure to file weekly itineraries, monthly new store action reports and other information. (Daniels Aff. at 12; Exh. F) Although H.T. Jones, Manager of Marketing Representation, wrote plaintiff citing plaintiff's failure to meet his 1986 objective of eight approved new store deals (Daniels Aff., Exh. G), Daniels' performance appraisal report

also noted that some of plaintiff's time might have been absorbed closing a large sale of a Firestone site in Manhattan, thus partially accounting for the low number. *Id.*

As 1987 began, plaintiff's performance deteriorated even further. On February 17, 1987, Jones sent another memo to plaintiff, this time admonishing him for having "zero new stores" approved in the first quarter, reminding him that his annual objective was eight approved new store deals, and warning him that he would need four approved new stores in the second quarter to be "on objective." (Daniels Aff., Exh. H) On March 10, 1987, Daniels also wrote plaintiff stating "we cannot continue to tolerate this kind of performance" and that "[a]nything less than full attainment of objective will not be accepted." (Daniels Aff., Exh. I) Plaintiff responded to this request by sending Daniels a list of five new store proposals. (Daniels Aff., Exh. J) Two months later, plaintiff had submitted only one new store proposal, even though his March memo had stated that five proposals were in progress. Daniels warned plaintiff that "[m]anagement cannot continue to tolerate such dramatic objective shortfall." (Daniels Aff., Exh. K) Jones also wrote to plaintiff stating that, in the first six months, plaintiff had obtained no approved new store deals and that he would need six new store deals during the third quarter to be on target. (Daniels Aff., Exh. L) On that memo, plaintiff listed seven new store deals he hoped to complete shortly.

At the end of May 1987, management approved the only proposal that plaintiff had submitted thus far in 1987: the Patchogue, New York proposal. On June 19, 1987, Daniels completed another performance evaluation of plaintiff and, because of plaintiff's failure to meet quotas and his inability to prepare proper site packages, rated him as failing to meet the job requirements. Plaintiff signed this appraisal. (Daniels Aff., Exh. M) At that time, Daniels and Jones concluded that plaintiff had to be discharged. On September 4, 1987, Jones and Daniels met with plaintiff in Woodbridge, New Jersey, and so informed

him. (Daniels Aff. at ¶¶ 21–22) Plaintiff was 65 years old at the time.

## II.

 Defendant now moves for dismissal of all claims. On the religious discrimination charge, defendant asserts that plaintiff's failure to file any charge with the EEOC or any state fair employment practices agency bars the claim. I agree and, accordingly, plaintiff's Title VII claim is dismissed. *See Mohasco Corp. v. Silver,* 447 U.S. 807, 825–26, 100 S.Ct. 2486, 2496–97, 65 L.Ed.2d 532 (1980); *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 555 n. 4, 97 S.Ct. 1885, 1887 n. 4, 52 L.Ed.2d 571 (1977); *Forts v. Ward,* 621 F.2d 1210, 1215 (2d Cir.1980). Defendant's RICO claim based on his assertion that he was fired because he threatened to reveal ongoing fraud by certain unnamed officers against the company is foreclosed by a recent Second Circuit decision, *Burdick v. American Express Co.,* 865 F.2d 527 (2d Cir.1989), which denied RICO standing to "whistleblowers," who do not suffer injury of the sort the statute was meant to combat. Accordingly, plaintiff's RICO claim is similarly dismissed.

### A. *Age Discrimination*

Plaintiff filed a timely charge with the Equal Employment Opportunity Commission (EEOC) alleging age discrimination and promptly filed the complaint herein on May 24, 1988. Thus, this court may consider the merits of his age discrimination claim. Defendant argues that summary judgment is warranted because plaintiff has failed to demonstrate any circumstantial evidence showing that defendant's decision to discharge him was based in any part on his age.

The three-step analysis for Title VII cases set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981) applies to cases brought under the ADEA.

*Montana v. First Federal Savings & Loan Assoc.*, 869 F.2d 100, 103 (2d Cir. Feb. 21, 1989); *Russo v. Trifari, Krussman & Fishel, Inc.*, 837 F.2d 40, 43 (2d Cir.1988); *Pena v. Brattleboro Retreat*, 702 F.2d 322, 323 (2d Cir.1983).

Under *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1824, the initial burden is on the plaintiff to establish a prima facie case of unlawful discrimination. If that burden is met, the burden then shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for its action. If the defendant meets this burden of production, then the plaintiff, upon whom the ultimate burden of persuasion rests, must show that the proffered reasons were not defendant's only reasons and that "age ... 'made a difference' in the employer's decision." *Paolillo v. Dresser Indus., Inc.*, 865 F.2d 37, 40 (2d Cir.1989) (quoting *Hagelthorn v. Kennecott Corp.*, 710 F.2d 76, 82 (2d Cir.1983)).

■ To establish a prima facie case of unlawful termination under the ADEA, plaintiff must show that he belongs to the protected age group, that he was qualified for the position that he held, and that he was discharged "under circumstances that give rise to an inference of discrimination." *Russo*, 837 F.2d at 43. This last factor may be shown by the fact that a younger employee replaced him, by direct evidence, statistical evidence, or circumstantial evidence such as documentation of satisfactory performance. *Montana*, 869 F.2d at 104; *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). Plaintiff here has shown that he is over 40 and thus belongs to the protected age group. Although plaintiff has perhaps shown that he was qualified to perform the job, he has not adduced a scintilla of any kind of evidence, whether circumstantial, direct, or statistical, from which a factfinder could infer that age played any part whatsoever in the employer's decision. Rather, he repeats conclusory statements of discrimination and urges this court to await his production of evidence at trial. Because principles of summary judgment require more than mere conclusory incantations of discrimination, plaintiff has failed to meet his burden on this motion.

A court may grant summary judgment under Fed.R.Civ.P. 56(c) only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ. P. 56(c). Even though a court must "resolve all ambiguities and draw all reasonable inferences in favor of the party defending the motion," *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985), *cert. denied*, —— U.S. ——, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987), Fed.R.Civ.P. 56(e) mandates that, "when a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)); *Fleming v. New York Univ.*, 865 F.2d 478, 483 (2d Cir.1989).

In discrimination cases, where questions of intent frequently abound, summary judgment is often inappropriate. *Meiri*, 759 F.2d at 998. Nevertheless, courts consider it inappropriate "only where solid circumstantial evidence exists to prove plaintiff's case," *Clements v. County of Nassau*, 835 F.2d 1000, 1005 (2d Cir.1987), because the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Thus, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." *Meiri*, 759 F.2d at 998.

Although plaintiff's entire offer of proof on this motion is a two and one half page affidavit with two documents attached, plaintiff having failed to file a Rule 3(g) statement, most of plaintiff's deposition has been reproduced by defendant and it is thus possible to discern the full breadth of

plaintiff's arguments against summary judgment. Plaintiff bases his age discrimination claim entirely on four pieces of circumstantial evidence. First, he claims that his application in 1985 for additional life insurance was misplaced. Second, he claims that he did not know of any other persons over age 65 employed by defendant. Third, plaintiff claims that, in January 1984, Ray Sherban, a Senior Coordinator for Construction in the Real Estate Department, told him that John Nevin, Firestone's President, had said that Firestone should "get rid of the World War II vintage." Fourth, plaintiff claims that Firestone unreasonably failed to approve his deals.

As to the additional life insurance coverage, plaintiff claims that Firestone purposely lost his application in 1985 and did so because he was too old. Plaintiff concedes that his supervisor and other Firestone employees worked with him in his efforts to obtain the coverage when he discovered he was not covered. (Littman Dep. at 577, 865–66) In fact, his account shows that the problem was the insurance company, not Firestone:

A. I went to my immediate supervisor, Joe Daniels, and he made some calls and he said there's nothing he can do and they called different people in Ohio [Firestone's offices], the people in charge of insurance and then I was transferred to the office in Woodbridge where someone who specializes in insurance for the company, he tried to handle it. The insurance company kept saying, well, if Mr. Littman wants insurance he has to fill out a new application and go for a physical exam.

Q. Did you do so?

A. No, I did not do that because I felt it was wrong. I'm an employee. No one else was taking any exam so I kept after them on it.

Q. After who, the life insurance company?

A. After the people in Ohio who handled this and the people from the insurance company. I kept getting a lot of doubletalk.

Q. From who?

A. From people in Ohio who said, don't worry, you're going to get it and from the insurance company who said, we don't have it and we can't give it to you and you have to take an exam.

Q. What else happened?

A. I went to an attorney who understands laws about insurance and everything else. He made one call to a John McMahon of the Johnson and Higgins Company [the insurance company]....

(Littman Dep. at 865–66) Plaintiff's own account shows that, to the extent that this was anything more than a routine bureaucratic blunder, it was the insurance company's fault. Plaintiff thus asks me to assume that, contrary to plaintiff's own account of assistance from defendant's employees, defendant induced the insurance company to deny him his life insurance policy. Plaintiff asks me to assume also that defendant was willing to hire him and provide him with all the medical and other benefits accruing to a full time employee, with all the possibilities that plaintiff's medical bills, because he was older than others, would be higher, but that defendant was unwilling, because of his age, to provide him with life insurance coverage. These two bizarre assumptions are without any basis in fact. Plaintiff has chosen not to conduct any discovery of defendant on this or any other matter. Without more, I am unwilling to indulge outlandish assumptions and find that plaintiff's lost insurance coverage two years before his discharge was anything other than an innocent bureaucratic mistake, notwithstanding plaintiff's subjective impressions. *Branson v. Price River Coal Co.*, 853 F.2d 768, 771–72 (10th Cir.1988) (subjective impressions of plaintiff not sufficient basis for inferring age discrimination to escape summary judgment).

Likewise, that plaintiff, employed in one small office of a company with offices nationwide, does not know any older people employed by Firestone is meaningless and cannot properly be used as a basis for inferring age discrimination against him in

his discharge. *See Haskell v. Kaman Corp.*, 743 F.2d 113, 119–20 (2d Cir.1984).

The comment allegedly made by Sherban to plaintiff in January 1984—that Firestone President John Nevin had said that the company should "get rid of World War II vintage" employees—cannot create an inference that Firestone discharged plaintiff because of his age. To survive summary judgment, the nonmoving party must identify sufficient *"admissible* evidence so as to demonstrate that there existed a genuine issue of material fact regarding the alleged agreement." *Trebor Sportswear Co. v. The Limited Stores, Inc.*, 865 F.2d 506, 510 (2d Cir.1989) (emphasis added); *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 467 (2d Cir.1989). The alleged statement is clearly inadmissible double hearsay. Because Sherban is not in Firestone's personnel department or plaintiff's direct supervisor, his statement deals with a subject not within the scope of his employment. (Sherban Aff. at ¶¶ 2, 3, 10). Accordingly, his statement is not admissible under Fed.R.Evid. 801(d)(2)(D). *See Howe v. Reader's Digest Assoc., Inc.*, 686 F.Supp. 461, 465 (S.D.N.Y.1988). Moreover, although Sherban does not remember whether he made any such statement to plaintiff, he asserts that he has never heard Nevin say any such thing. (Sherbin Aff. at ¶¶ 6, 7) Thus, this statement may be triple or more hearsay. Finally, given the context in which this statement was uttered—Sherbin allegedly made this statement to plaintiff during the course of a two day tour in and around New York City during which time "we gossiped about almost every imaginable topic" (Sherbin Aff. at ¶ 5), I find it insufficiently trustworthy to fall within the general exception to the hearsay rule. Fed.R.Evid. 803(24).

Plaintiff's final claim is that Firestone management unreasonably refused to approve plaintiff's deals. Beside the fact that it is patently illogical to imagine that Firestone would pass up lucrative deals just to hurt plaintiff's record, plaintiff of-

fers only conclusory statements of a grand conspiracy to injure him. The only fact he cites to is inconclusive. Specifically, he claims that he sent Dennis Bucher, a site inspector, a list of 54 proposed sites on March 3, 1986 and that Bucher failed to examine the sites. Shortly after the date of the memorandum, however, plaintiff changed offices and Firestone employees Ed Bory and John Laponi were then put in charge of inspecting his sites, so it is not clear that this memorandum proves anything. (Littman Dep. at 510–513)

In sum, plaintiff has failed to produce even a scintilla of admissible circumstantial evidence from which one could infer that age played any part whatsoever in defendant's decision to discharge him. To the contrary, all available evidence points in the other direction. Defendant hired plaintiff when he was 61 years of age and offered him many chances to improve his performance and recordkeeping, over and over again giving him the benefit of the doubt. Plaintiff, in response to defendant's persuasive offer of proof, offers nothing more concrete than conclusory statements of discrimination. It is abundantly clear that the age discrimination claim here is without merit.

Alternatively, even if somehow plaintiff's showing were sufficient to make out a prima facie case, defendant has advanced and fully documented a legitimate reason—namely plaintiff's poor job performance—and plaintiff has failed to produce any admissible evidence to suggest that that reason is pretextual.

### B. *Retaliatory Claim*

Plaintiff's third claim, to the extent that it makes any sense at all, was read correctly by defendant as a common law wrongful discharge claim in which plaintiff claimed that defendant had offered him a "lifelong job." (Littman Dep. at 206–7) Apparently recognizing the futility of that legal claim,[1] plaintiff now avers instead

---

1. The statement was made in the context of plaintiff's questioning defendant's personnel representatives about the company's retirement policy and thus, as he himself admitted, was not

a guarantee of a lifelong job, but rather an indication that defendant did not have a policy of forcing older employees out. *See Littman Dep. at 211 ("[The statement meant that the

that he "is an at-will employee protected by the Conscientious Employee Protection Act of New Jersey [hereafter CEPA]." Pltf.'s Memorandum in Opposition at 4. Specifically, recasting his third claim, plaintiff charges that he was fired because, on July 10 and 14, 1987, plaintiff sent messages to his superiors demanding an investigation into the purchase of a store site in Succasunna, New Jersey. Plaintiff claims that he was near signing a contract for the site for $329,500, but that another Firestone negotiator purchased the site for $495,000. Plaintiff claims this incident was part of a larger scheme whereby other Firestone employees conspired to place choice store sites in the hands of Firestone's competitors. Littman explains the conspiracy as follows:

> [T]here's a conspiracy going on, where Littman brings in a site on Central Park Avenue and there's a certain group involved internally saying well, that's a great site, we stall Littman or tell the lawyer we don't want it or the owner and we send in a competitor ... to buy it. I'm giving you what could take place. I got the pattern of over twenty—of similar things that happened. It seems odd that over twenty different deals show the same pattern. It does seem odd to me.

(Littman Dep. at 475) Although defendant complains that this sudden change of plaintiff's legal position is unfair, I will consider it for one specific reason. As the third claim, if anything, stated a cause of action

for common law wrongful discharge and New Jersey law allows a plaintiff to sue either directly under CEPA or indirectly as a common law wrongful discharge claim asserting a violation of public policy, namely CEPA, *see Smith v. Ebasco Constructors, Inc.*, 87 Civ. 4170 (AMW) slip op. at 8 n. 3, 1988 WL 44143 (D.N.J. May 4, 1988), plaintiff has not completely changed the legal claim he is asserting such as to prejudice defendant. His claim is still one for common law wrongful discharge, only now he is asserting a violation of public policy, CEPA, rather than a violation of a "lifetime" employment contract.

Defendant challenges whether New Jersey law should apply to this common law claim, asserting that New York has a greater interest in the employment contract at issue here because plaintiff was a New York resident and performed some of his work in New York. Under *Klaxon v. Stentor Electric Mfg Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), this court must apply New York's choice of law rules in a diversity action in determining which state's laws apply. New York courts apply "the law of the jurisdiction having the greatest interest in the litigation." *Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 382, 248 N.E.2d 576, 582, 300 N.Y.S.2d 817, 825 (1969). The evidence shows that, although plaintiff was a New York resident and some of his work was done here, his office was, at all times, in New Jersey, where he was also formally discharged. (Littman Aff. at ¶ 2) Defen-

---

company doesn't] look at a man's age, that [instead it] look[s] at what a man can do and they were very nice in discussing this with you.") Even if this statement was actually a guarantee, defendant's handbook clearly stated that plaintiff was an at-will employee. In similar situations, general statements of this type have been held by both New York and New Jersey courts insufficient to state a cause of action. *See Wright v. Cayan*, 817 F.2d 999, 1003–05 (2d Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 157, 98 L.Ed.2d 112 (1987) (affirming summary judgment for defendant because letters to plaintiff containing a reference to "permanent appointment," coupled with a statement that plaintiff would serve "at the pleasure of the supervisor," did not restrict employer's right to terminate at will); *Hunnewell v. Manufacturers Hanover Trust Co.*, 628 F.Supp. 759, 762 (S.D.N.Y.1986) (plaintiff's allegations that employer promised

employment "through normal retirement age" and for plaintiff's "full working life" were insufficient to alter employee's at-will status); *Shebar v. Sanyo Business Sys. Corp.*, 111 N.J. 276, 544 A.2d 377, 382 (1988) (employer's promise of continued employment for satisfactory performance does not change an employment at-will relationship, unless the parties exchange additional consideration and specify precise terms of employment). New York and New Jersey courts have also held that, absent a violation of public policy or law, an employee may not escape the operation of the employment-at-will rule by labeling as tortious the events surrounding his discharge. *See Monsanto v. Electronic Data Systems Corp.*, 141 A.D.2d 514, 529 N.Y.S. 2d 512, 515 (2d Dept.1988); *Schwartz v. Leasametric, Inc.*, 224 N.J.Super. 21, 539 A.2d 744, 749 (App.Div.1988).

dant is an Ohio corporation and it was in Ohio that plaintiff was interviewed and offered the position. Moreover, although defendant has not presented any evidence on where the decision to discharge was made except to note that it was not made in New Jersey, it was probably at least partly made in Ohio where Firestone had its personnel office, in addition to Philadelphia where Daniels' office was located. Indeed, if anything, the proper contest here is between New Jersey and Ohio law, not New Jersey and New York law, because courts still consider significant the place where the contract was negotiated and the decision to discharge was made, despite the alleged demise of the *lex loci contractus* doctrine whereby the law of the place where the contract was entered into would automatically be applied. *See Zanfardino v. E–Systems, Inc.,* 652 F.Supp. 637, 639–40 (S.D.N.Y.1987) (Weinfeld, J.) (applying law of state where, *inter alia,* employment contract was negotiated, defendant's main offices were, and termination decision was made, even though employee worked elsewhere).

 The choice of law issue is important because plaintiff would not be able to maintain his claim under either New York or Ohio law. Ohio does not recognize a cause of action for whistle-blowers. *See Phung v. Waste Management, Inc.,* 23 Ohio St.3d 100, 491 N.E.2d 1114 (1986); *see also Phung v. Waste Management, Inc.,* 40 Ohio App.3d 130, 532 N.E.2d 195 (Ct.App.), *jurisdictional motion overruled,* 38 Ohio St.3d 702, 532 N.E.2d 1317 (1988). New York, by statute, affords a limited cause of action for employees who disclose or threaten to disclose an employer's activity that is in violation of a law "which violation creates and presents a substantial and specific danger to the public health or safety." N.Y.Lab.Law § 740(2)(a) (McKinney 1988). Plaintiff's complaint neither alleges nor could it allege any danger to the public health or safety sufficient to make out a claim under New York law as it concerns pure fraud practiced against defendant by its employees. In sharp contrast, New Jersey's CEPA provides a cause of action for any employee who "discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law." N.J.Stat.Ann. § 34:19–3(a). As fraud is certainly a violation of the law, plaintiff's complaint at least *prima facie* comes within the confines of CEPA.

Because plaintiff's office was in New Jersey and plaintiff was informed of his discharge in New Jersey, and thus plaintiff was an employee in New Jersey, New Jersey has the greatest interest in protecting employees in its state and thus has the paramount interest in this lawsuit. *Accord Rowe v. Basix Corp.,* 86 Civ. 5595 (RLC), slip op. at 4, 1988 WL 64867 (S.D.N.Y. June 14, 1988). Ohio's interest, while weighty because defendant is an Ohio corporation, is not as substantial because its contacts with the transaction at issue are fewer. In a very real sense, the conduct at issue in this case occurred in New Jersey. *Compare with Zanfardino,* 652 F.Supp. at 640 (foreign country did not have strong interest because performance did not actually occur there). Accordingly, I will apply New Jersey law.

It seems illogical to hold that a whistle-blower statute, obviously aimed at activity by the company against either the public at large or other individuals or corporations, could apply to a situation where the employee was fired for claiming that some company employees were defrauding the company itself. Because many companies are publicly-held entities, however, it is conceivable that company officers could connive to raid the corporate treasury, such that one could logically posit a situation such as plaintiff's, where company officers could fire an employee for blowing the whistle on fraud within the corporation. Furthermore, in his complaint, plaintiff also alleges that defendant defrauded its insurance carrier by instructing plaintiff to file his claim for medical and hospital bills with his wife's insurance carrier, thus according to plaintiff defrauding his wife's insurance carrier. (Complaint at ¶ 10(n))

That plaintiff's complaint might fall within the broad and seemingly all-encompassing[2] parameters of the CEPA does not end our inquiry. Because defendant has moved for summary judgment, and this court applies federal court rules on summary judgment, *see Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965), plaintiff must do more than repeat wild allegations of conspiracy in order to prevail here. Plaintiff cannot await trial, but must show facts sufficient to show essential elements of the case as to which he has the burden of proof. *Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. The CEPA statute requires that plaintiff show two factors. First, he must show that his belief that illegal conduct was occurring had an objectively *reasonable* basis in fact—in other words that, given the circumstantial evidence, a reasonable lay person would conclude that illegal activity was going on. *Cf. Ebasco Constructors,* 87 Civ. 4170, slip op. at 5–6 (Courts must "distinguish between subjective and objective considerations, that is, the employee's own personal values on the one hand and public policy on the other" in deciding the applicability of CEPA). *See also Kalman v. Grand Union Co.,* 183 N.J.Super. 153, 156, 443 A.2d 728, 729 (App.Div.1982) ("The task of a court [in CEPA cases] is to distinguish between subjective and objective considerations, that is, the employee's own personal values on the one hand and public policy on the other."); *see also Pierce v. Ortho Pharmaceutical Corp.,* 84 N.J. 58, 417 A.2d 505 (1980).[3] Although the "reasonable belief" requirement must take into account that most plaintiffs are unschooled in the law and, furthermore, that exigencies of the circumstances usually bar the employee from further investigation, plaintiff's belief cannot be without any objective basis—whether circumstantial or direct. Second, plaintiff must show that he disclosed or threaten to disclose the activity to a supervisor or public body; that he was fired; and that there is a "causal connection between [his whistle-blowing and his termination], that is, a retaliatory motive played a part in the adverse employment [action]." *Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 46 (2d Cir.1980) (Title VII retaliatory discharge claim).

Plaintiff cites in his complaint twelve instances in which defendant decided to reject sites he was investigating; all, in his view, were incorrect business decisions. As to most of these instances, plaintiff offers no facts whatsoever to support his subjective contention. Plaintiff does not know the name of the individuals involved. (Littman Dep. at 700) The wild claims in his complaint of insurance fraud have not been supported with any documentation in the form of affidavits or other admissible evidence. What little is presented in the portions of the deposition provided by defendant also do not support any of plaintiff's allegations in his complaint. Indeed, the one instance other than the Succasunna incident described in plaintiff's deposition illustrates the subjective nature of plaintiff's claims of illegal activity. Plaintiff recounts a sales staff meeting in Atlantic City which he calls the "Atlantic City Caper" because, he claims, it shows that Firestone employees were "defrauding" the company:

> ... I thought, finally, good, we'll have a nice meeting for two days and discuss all deals and meet the new people that they hired.... Instead, of having a meeting for two days, we had a meeting for an hour and a half and most of them were

---

**2.** However, there are some limits to the statute's reach. *See Smith v. Travelers Mortgage Servs.,* 699 F.Supp. 1080, 1082–83 (D.N.J.1988) (rejecting argument that filing EEOC discrimination complaint amounts to whistle-blowing).

**3.** Although both *Kalman* and *Pierce* predate CEPA, because CEPA "codifies" the "preexisting common law tort cause of action," *Lepore v.*

*National Tool & Mfg. Co.,* 224 N.J.Super. 463, 540 A.2d 1296, 1298 (App.Div.1988), the test in those cases is apparently mirrored in the statute's requirement that the employee believe that an *illegal* act has been committed and that this belief be *reasonable: i.e.,* have some objective basis in fact.

gambling all the time.... [T]o reiterate, two days of company time meeting only an hour and a half [and] most of the time [was] spent gambling and boozing.

(Littman Dep. 861–62) Whatever plaintiff's view of fraud, it clearly does not comport with the law. Nor does it comport with what a reasonable layperson would consider "fraud."

█ In only one incident has plaintiff adduced any circumstantial evidence at all to support his subjective view that fraud was going on: the Succasunna property which plaintiff claims Firestone bought for an exorbitant price. Although plaintiff claims defendant pursued an investigation regarding this purchase (Littman Dep. at 342), plaintiff has conducted no discovery to reveal any admissible documents in defendant's possession regarding the transaction or even to confirm that, in fact, such an investigation was pursued. Rather, plaintiff rests his case on the price differential:

Q. What you say there was fraud, what do you mean by fraud?

A. I think fraud means that when I have a contract for $329,000 and the same company is going to pay $495,000, that to me is fraud. That's all I can tell you.

Q. Nothing else that you would rely on in fraud other than difference in price?

A. How does it sound to you?

(Littman Dep. at 335) Although defendant points out in its legal memorandum that price is only one of many variables in the purchase of a store site, this circumstantial evidence is minimally sufficient to show that plaintiff's belief that illegal activity was occurring had a reasonable basis in fact.

Plaintiff has also met the second requirement. He has shown that he sent a wire to his superiors on July 10, 1987 questioning why defendant had purchased the Succasunna property for $495,000. On July 14, 1987 he sent a follow-up memorandum to Daniels stating:

"Shades of Iran–Contra Hearings!!!"

"Do we have a Real Estate Department within a Real Estate Department?"

The mental midget who offered $495,-000.00 vs my pending Deal of $329,500.00 is not only Defrauding Firestone, but has now put my deal in total jeopardy ... [I]t is inconceivable that the same property selling last year in Succasunna for $329,500.00 has now suddenly become worth $495,000.00 "Preposterous!"

In fact, besides being a problem site ... $495,000.00 is over market.

I request an immediate investigation.

(Littman Aff., Exh. C) Although the tone of these memoranda is bombastic, they clearly constitute a disclosure to a supervisor sufficient to meet the statute's requirements. Plaintiff has also shown that he was fired on September 4, 1987. Although Daniels avers that he decided to fire plaintiff for incompetence one month before (Daniels Aff., Exh. 21), defendant has not provided any evidence here to account for the two and a half month gap between Daniels' decision to fire plaintiff and plaintiff's actual termination. Despite defendant's strong showing that plaintiff's job performance in fact was poor and thus that the decision was made in June, defendant has not produced any documentation, other than Daniels' affidavit, to show that the decision to terminate was made before plaintiff sent the memoranda. The timing of plaintiff's discharge raises an inference that his whistle-blowing may have played a part in the decision to terminate him. Accordingly, plaintiff has adduced sufficient —albeit feeble—circumstantial evidence such that summary judgment at this stage would be inappropriate.

### III.

Defendant's motion for summary judgment is granted on plaintiff's Title VII, ADEA, and RICO claims. Summary judgment is denied on plaintiff's common law wrongful discharge claim asserting a violation of New Jersey's whistle-blowing stat-

ute.[4]

SO ORDERED.

---

4. Because CEPA provides for punitive damages, defendant's motion to strike plaintiff's punitive damages claim is denied.