Henry ROTTERSMAN, Plaintiff,

v.

CBS INC., Defendant.

No. 87 Civ. 7903 (PKL).

United States District Court,
S.D. New York.

Dec. 7, 1989.

Henry Conan Caron, New York City, for plaintiff.

Gallagher & Gosseen, New York City (Robert I. Gosseen, Barbara Flessas, Robert A. Sparer, of counsel), for defendant.

## ORDER & OPINION

LEISURE, District Judge:

Plaintiff Henry Rottersman brings this action for alleged violations of the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. § 621 *et seq.*, by his former employer, defendant CBS Inc. Rottersman claims that he was unlawfully fired by CBS on account of his age, and he asks for whatever relief, monetary or injunctive, the Court thinks appropriate. Defendant answered, claiming in its third affirmative defense that the applicable two-year statute of limitations had run. Plaintiff filed a motion to strike defendant's third affirmative defense, alleging that the Age Discrimination Claims Assistance Act of 1988, Pub.L. No. 100–283, 102 Stat. 78, applies to the instant case and increases the statute of limitations. Defendant opposed plaintiff's motion and filed a cross-motion for summary judgment pursuant to Fed.R.Civ.P. 56, seeking to dismiss the complaint in its entirety.

## BACKGROUND

### A. Overview

On November 12, 1984, plaintiff Henry Rottersman was fired from his job as di-

rector of special projects in the manufacturing division of the CBS Records plant at Milford, Connecticut. Rottersman, who was 62 years old at the time, contends that he was fired on account of his age. Defendant CBS argues in response that a broad economic retrenchment was responsible for the termination of Rottersman's job, and that "his layoff was an objective component of a streamlining and consolidation of operations recommended by an outside management consultant." Affidavit of Walter L. Dean,[1] sworn to on April 19, 1989, ¶ 5.

To survive a motion for summary judgment, a plaintiff in an age discrimination suit must demonstrate, among other things, that circumstances exist surrounding his discharge which give rise to an inference of age discrimination. *Montana v. First Federal Savings and Loan Association of Rochester,* 869 F.2d 100, 105 (2d Cir.1989). The detailed factual discussion which follows should be considered in light of this legal standard.

Rottersman points to a variety of circumstances which he claims strongly suggest discriminatory motives on the part of CBS. He contends that he was the only engineer laid off at the Milford, Connecticut plant at the time of the supposed retrenchment and that a younger man was hired in CBS's New York office to take over his duties. Rottersman also puts forward evidence that CBS made no effort to relocate him in violation of its own policy manual, that the officer who fired him had in the past made remarks suggesting discriminatory motives, and that no officer of defendant has yet to take ultimate responsibility for making the decision to terminate his job. Finally, Rottersman points to a finding by the Equal Employment Opportunity Commission (the "EEOC") that age was a factor in defendant's decision not to relocate him. Rottersman argues that these circumstances, as well as others, create an inference of age discrimination.

### B. The Economic Restructuring of CBS Records

A brief summary of the economic organization and recent history of the CBS Records plant at Milford, Connecticut is in order before relating the facts of plaintiff's case. Throughout the 1970s, CBS Records, a division of CBS Inc., operated six plants in the United States. The Milford plant acted as a central administrative facility for the manufacturing operations at five regional plants.[2] Engineers at Milford conducted research and development on new technologies in the record industry and assisted the regional plants in applying these technologies to the manufacturing process. The record industry experienced strong growth and rising revenues during the 1960s and 1970s, and the Milford plant was fully engaged in modernizing the manufacturing capacities of CBS Records.

In 1979, sales in records and tapes began to decline, and the industry as a whole entered a period of stagnation. The parties are in dispute as to the extent of this stagnation and its effects on CBS Records. CBS emphasizes the fact that three of the five regional plants which Milford had serviced were closed during the next several years.[3] Because of these closings, CBS argues, the need for Milford's central functions was diminished, and it was reorganized for "downsized manufacturing services." Dean Aff., ¶ 15. Rottersman claims that CBS has exaggerated its business slump and that the records division made its highest profits ever in 1984. He notes that CBS completed a new plant at Carrollton, Georgia during the same year. Rottersman also points out that the Hawthorne, New Jersey plant was closed not because the company no longer needed the jackets, labels, and components made

---

1. Executive vice president of CBS Records Operations.

2. The regional plants were located at Hawthorne, New Jersey; Pitman, New Jersey; Terre Haute, Indiana; Santa Maria, California; and Danbury, Connecticut.

3. The Hawthorne, New Jersey plant closed in 1979, the Santa Maria, California plant in 1981, and the Terre Haute, Indiana plant in 1982.

there, but because the decision was made to purchase these items from outside vendors. Affidavit of Henry Rottersman, sworn to on June 29, 1989, ¶¶ 38–40.

The largest area of dispute between the parties concerns the effects of the economic downturn on staffing needs at the Milford plant, specifically the decision to terminate Rottersman's job. CBS emphasizes the findings of a report prepared by the outside management consulting firm of Cresap, McCormack and Paget Inc. (the "Cresap Report"). The Cresap Report advised that the staff at Milford be reorganized to better match authority and accountability. Cresap Report, Defendant's Exhibit C, at III–7. The Report recommended that "The Manufacturing unit [to which plaintiff belonged] would be composed of the plants [and] a small central staff group." *Id.* at III–29. Walter Dean, executive vice president of CBS Records Operations, states that "[s]enior management reviewed the Cresap Report and finding it right on target, fundamentally restructured CBS Operations' activities in Milford in line with the report's recommendations." Dean Aff., ¶ 20.

Rottersman argues in response that the Cresap Report nowhere advocated any layoffs at the Milford plant, and that its recommendations are too general to be connected directly to his job loss. Rottersman Aff., ¶¶ 51–52. There is also evidence that key executives either did not rely on the Cresap Report in making staffing decisions or were not aware of it. Rottersman claims that Samuel Burger, the head of the Milford facility who fired him, has stated that he did not rely on the Cresap Report in reducing headcount at Milford. Rottersman Aff., ¶ 47. William Almroth, vice president of manufacturing located in New York City, did not see the Cresap Report until the fourth quarter of 1984, after the decision to fire Rottersman had already been made. Rottersman Aff., ¶ 48. Neither Walter Dean nor Howard Korchin, director of personnel services for the manufacturing division of CBS Records, can rec-ollect relying on the Cresap Report to reorganize and downsize the Milford plant. Rottersman Aff., ¶¶ 49–50. Thus Rottersman contends that CBS has not shown a nexus between the Cresap Report and the termination of his job.

On May 7, 1984, CBS issued a memorandum on its intended reorganization of CBS Records. The memorandum, written by Walter Dean, indicated that management had been "heavily engaged in consolidating and streamlining its physical facilities to reduce fixed costs." Defendant's Exhibit D. The memorandum also announced that the manufacturing division of CBS records group would now consist of "the Plant Managers and a central staff group to be headquartered in New York." For purposes of this motion, Dean has stated that the proposed manufacturing administration group was intended to be "smaller" than before. Dean Aff., ¶ 23. As with the Cresap Report, Rottersman argues that the memorandum does not indicate or suggest a business decision to fire him, because nowhere does it say that layoffs will occur. Rottersman Aff., ¶ 56. Rottersman contends that Dean, in his affidavit, attempted to bend the meaning of the May 7, 1984 memorandum in order to create a justification for his discharge. Rottersman Aff., ¶¶ 56, 58.

### C. Plaintiff Rottersman's Career at CBS

Henry Rottersman was hired by CBS Records in 1969 as director of engineering services, an administrative and technical position in the research and development division of the Milford plant. Rottersman's graduate and undergraduate training were in mechanical engineering,[4] and he had worked as a mechanical engineer for twenty-four years before coming to CBS. In 1974, Rottersman was transferred to the manufacturing division at Milford where he worked until his discharge in 1984.

On November 12, 1984, Rottersman was told by the head of the Milford plant, Samuel Burger, who held the position of senior

---

**4.** Rutgers University, B.S. in mechanical engineering (1944); New York University, masters in mechanical engineering (1947); New York State Professional Engineering License (1948).

vice president of research and development, that he was fired as of November 30. It is undisputed that Rottersman was the only engineer laid off at Milford during 1984. CBS claims, however, that four other "technical personnel" were fired during 1984. Dean Aff., ¶ 38. Rottersman points out that in reality only three were fired and one transferred, and that all four had been working on the video disc program which failed outright at that time. Rottersman Aff., ¶¶ 42–43. At least three of the four had been hired in the last three years for the specific purpose of staffing the video disc program. Thus Rottersman argues that, aside from the video disc program, he was the only technical worker fired during 1984, and that there was no general employment decrease at Milford during the period. He claims that CBS has exaggerated the effects of the economic retrenchment and restructuring which took place at Milford in order to create a pretext for his release.

Rottersman claims that, prior to his discharge, Samuel Burger had on repeated occasions asked him why he did not retire. Rottersman Aff., ¶ 16. At the time these statements were made, Rottersman did not think that they were significant. But given the unfolding sequence of events, Rottersman now feels that Burger had been "feeling me out for voluntary retirement for some time because of my age." Rottersman Aff., ¶ 102.

Rottersman's duties up to the time he was discharged had continued as normal. Rottersman Aff., ¶ 64. Though Rottersman did assist in the temporary occupation of closing the regional plants at Santa Maria, California and Terre Haute, Indiana, in 1981, 1982, and 1983, he claims that this took up a minimal amount of his time. Rottersman Aff., ¶ 41. In the period just prior to his release, Rottersman was assigned to a new audio cassette project which he worked on up to his final day on November 30, 1984. Rottersman emphasizes that he possessed varied skills in both research and manufacturing, and that he was not solely a "plant closer" whose role disappeared when the regional plants finally closed their doors. Rottersman Aff., ¶ 11.

Rottersman points out that no individual executive at CBS has taken responsibility for the decision to fire him. Rottersman Aff., ¶¶ 89–96. None of those who would be expected to hold decision-making authority in this regard—Burger, Dean, William Almroth (vice president of manufacturing), Howard Schwartz (Rottersman's direct supervisor), or Joseph Paz (the personnel director at Milford)—accepts responsibility for deciding to fire Rottersman. In fact, neither Schwartz nor Paz admit to having any knowledge of Rottersman's discharge prior to its occurrence. The decision to fire Rottersman was made prior to October 13, 1984, the date indicated on his severance pay approval letter. Yet none of the most involved executives knew when, how, or by whom the decision was reached. Rottersman emphasizes the generally suspicious nature of these circumstances, and also argues that, if his discharge was part of a true restructuring of Milford, it is unlikely that these executives would not know of it or accept responsibility for it.

### D. The New Manufacturing Division at CBS Records

Rottersman's description of the reorganization of the manufacturing division portrays a shuffling of personnel between Milford and New York City and between the manufacturing and research and development divisions at Milford. Also, a new manufacturing executive was hired in New York. Rottersman contends that he was the only employee to fall between the cracks in the reorganization and be discharged by CBS.

In June, 1984, CBS hired William Almroth, age 53, to be vice president of manufacturing in New York City. Almroth was hired after the reorganization memorandum of May 7, 1984, but before Rottersman was fired in November. Rottersman claims that Almroth, who, similar to him, had a graduate degree in mechanical engineering, took over his function in New York. Rottersman Aff., ¶ 99. After the reorganization, regional plant managers re-

ported directly to Almroth, when, in the past, they had reported to Rottersman. CBS contends that Rottersman was no longer needed to act as a liaison with the plant managers.

During the reorganization of Milford, seven employees in the manufacturing division were transferred to New York, all of them younger than Rottersman. At a meeting at Milford, Rottersman told Almroth that he too would like to be transferred to New York, and Almroth said he would look into it. Rottersman Deposition, at 107–08. Also at that time, five individuals were switched from the manufacturing division to research and development within the Milford plant. Those who remained in the manufacturing division at Milford were substantially younger than Rottersman, except for one individual who was sixty-one years old. Rottersman Aff., ¶ 65.

Rottersman claims that prior to 1984, the research and development and manufacturing divisions were not distinct entities, and that employees performed tasks associated with both divisions. Rottersman Aff., ¶ 9. Rottersman says that he did both research and development and acted as a liaison to plant managers, assisting them in modernizing their manufacturing processes. Thus while CBS attempts to portray Rottersman as only able to do manufacturing work, Rottersman contends that he was fully capable of doing design work as well. Rottersman states that he was originally hired to do design work, that he had done design work in prior jobs, and that, even after his transfer to the manufacturing division in 1974, he did considerable design-related work. Rottersman Aff., ¶¶ 3, 5–6, 8. More specifically, Rottersman states that he did much of the design work for the records operation of the new Carrollton, Georgia plant starting in 1978, and that in his final months at CBS he was preparing design drawings for an audio cassette project. Rottersman Aff., ¶ 8. Thus there is no reason why he could not have been moved into the research and development division at Milford.

### E. Rottersman's Request for Relocation

The week after he was fired Rottersman made a request to Joseph Paz, personnel director at Milford, that he be relocated within the CBS corporate system. Rottersman Aff., ¶ 18. The CBS Personnel Policy states that for employees with fifteen or more years of service at CBS, "[t]he feasibility of placing such individuals in other jobs within the Company must be considered before [dismissal]." Plaintiff's Exhibit M. Though Rottersman never heard back from Paz on the subject, on November 20, Howard Korchin, chief personnel officer of the manufacturing division, telephoned Rottersman and told him that he had made two calls in an attempt to relocate him but had not been successful in finding an open position. Rottersman Aff., ¶ 26. Rottersman believes that these steps had been taken by Korchin in the previous twenty-four hours. Rottersman Aff., ¶ 26. He claims that the letter and spirit of the CBS Personnel Policy has been violated, as he was never asked his views on relocation prior to his discharge. At the moment of his discharge, Rottersman asked Burger about possible relocation, and Burger said he did not think Rottersman wanted to be relocated. When Rottersman responded "why didn't you ask me?", Burger said nothing and then changed the subject. Rottersman Aff., ¶ 15.

### F. Rottersman's Complaint with the EEOC

On November 21, 1984, soon after he had been fired, Rottersman filed a charge of age discrimination with the Equal Employment Opportunity Commission in New York. CBS responded to the EEOC charges with two letters during the early part of 1985 which, Rottersman contends, contain "deliberate misrepresentations and evasions." Rottersman Aff., ¶ 35. The EEOC determined as follows:

The investigation disclosed that as a result of a reorganization Respondent [CBS] closed some of its operations in its Connecticut office. Of eleven employees who were affected by the reorganization, Charging Party [Rottersman], an em-

ployee with more than fifteen years of experience with Respondent, was the only person not offered to relocate. It is significant to note, that one of those was twenty two years old with considerably less years of experience than Charging Party.

Plaintiff's Exhibit N. The EEOC's bottom-line finding was that "reasonable cause [exists] to believe that the Charging Party's age was the factor in Respondent's refusal to offer him the opportunity to relocate." *Id.*

Rottersman claims that CBS retaliated against him for filing his EEOC complaint by temporarily blocking wages owed to him and withholding promised severance pay. At the same moment when Rottersman was fired, Samuel Burger promised him eight weeks of discretionary severance pay. Rottersman Aff., ¶ 15. When he finally left work, Rottersman was also owed wages for one week and accrued vacation pay. On November 30, 1984, Rottersman's last day on the job at Milford, Burger attempted to have Rottersman sign a form releasing all claims against CBS. When Rottersman refused to sign, Korchin called from New York to try to persuade him to do so. Korchin represented to Rottersman that the wages and accrued vacation pay owed to him would not be paid unless he signed the form. Rottersman Aff., ¶ 28. Rottersman still refused to sign the release as his complaint was then pending before the EEOC. Though the wages and vacation pay were eventually given to Rottersman in 1985, the severance pay has never been disbursed to date.

## DISCUSSION

### A.  Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

The substantive law governing the case will identify those facts which are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.... [I]t is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The Court then must determine whether there does indeed exist a genuine issue as to any material fact; "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2511; *see also R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102 (2d Cir.1989). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). *See also Trebor Sportswear Co. v. The Limited Stores, Inc.*, 865 F.2d 506 (2d Cir.1989). However, Rule 56 does not require that the moving party support its motion with affidavits or other similar materials which negate the opponent's claim. Rather, "the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Celotex, supra*, 477 U.S. at 323, 106 S.Ct. at 2553. The burden on the moving party will be "discharged by 'showing' —that is, pointing out to the District Court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554.

Indeed, once a motion for summary judgment is properly made, the burden then shifts to the non-moving party, which "must set forth specific facts showing that there is a genuine issue for trial."

*Anderson, supra,* 477 U.S. at 250, 106 S.Ct. at 2511. Because the District Court must determine "whether there is a need for trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," *id.*—the nonmoving party must produce, at the summary judgment stage, "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.... If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. at 2511. While the Court "must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought," *Heyman v. Commerce and Indus. Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975) (citations omitted), the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citations omitted).

Ultimately, "[i]n considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986) (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986)), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

### B. Age Discrimination

■ To establish a prima facie case of age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.,* the plaintiff must show that (1) he was in the protected age group; (2) he was qualified for the job; (3) he was discharged; and (4) the discharge occurred under circumstances giving rise to an inference of age discrimination. *Montana v. First Federal Savings and Loan of Rochester,* 869 F.2d 100, 104 (2d Cir.1989); *Pena v. Brattleboro Retreat,* 702 F.2d 322, 324

(2d Cir.1983). These factors were originally developed in the context of race discrimination lawsuits under Title VII, *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), but have been adapted for use in age discrimination actions. *Montana, supra,* 869 F.2d at 104.

■ A common response on the part of defendants in age discrimination suits is that an economic downturn required layoffs and that a legitimate, non-discriminatory reason for the plaintiff's dismissal exists. In a reduction-in-force case or a structural reorganization case, however, the plaintiff still need do no more than establish an inference of age discrimination to make a prima facie case. *Id.* at 105. The plaintiff need not show that he was replaced by a younger, newly hired employee. *Id.; Pena, supra,* 702 F.2d at 324. The plaintiff need not prove that the employer's stated reasons for dismissal are false but only that age did make a difference. *Montana, supra,* 869 F.2d at 105. The court may look behind the defendant's good faith business judgments to determine if the decision was discriminatory. *Id.* at 106.

■ The central issue to be decided on a motion for summary judgment is "whether [the] plaintiff has presented sufficient evidence to permit a reasonable fact-finder to conclude that age was a determinative factor in the employer's decision." *Montana, supra,* 869 F.2d at 104 (*quoting Hagelthorn v. Kennecott Corp.,* 710 F.2d 76, 81 (2d Cir.1983)). The court must consider the cumulative weight of the evidence in determining whether the plaintiff has established a prima facie case and defeated summary judgment. *Vaughn v. Mobil Oil Corporation,* 708 F.Supp. 595, 601 (S.D.N.Y.1989). This Court has recently indicated that the granting of summary judgment may be inappropriate in age discrimination cases where questions of intent will ultimately be determinative. *Littman v. Firestone Tire and Rubber Co.,* 709 F.Supp. 461, 465 (S.D.N.Y.1989); *see also Ramseur v. Chase Manhattan Bank,* 865 F.2d 460,

465 (2d Cir.1989) (in race discrimination suit, Second Circuit stated that "[w]e have repeatedly noted that 'summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated.' " (citations omitted)).

■ Plaintiff Rottersman has put forward evidence, which, when viewed cumulatively and in a light most favorable to him, establishes a prima facie case of age discrimination. First, it is undisputed that Rottersman is over 40 years of age and thus within the class of persons protected by the ADEA. Second, Rottersman has made a prima facie showing that he is fully qualified to perform a variety of tasks at CBS Records, both in the manufacturing and research and development divisions. Third, Rottersman has shown that he was discharged from his job during November, 1989. Fourth, Rottersman has demonstrated circumstances surrounding his discharge which raise inferences that age was a factor in his dismissal. This final point deserves elaboration.

Viewing the facts surrounding Rottersman's dismissal in a light most favorable to him—and, indeed, there are many disputes over factual matters between the parties—the Court has determined that the following circumstances existed: clearly, there was a substantial reorganization of the manufacturing division of CBS Records at the Milford plant in 1984. Rottersman has shown that, aside from the video disc program, he was the only technical employee laid off at Milford during the period in question. A substantial number of employees in the manufacturing division were transferred to the CBS offices in New York, and a similar number were moved into the research and development division at Milford. Though Rottersman asked to be transferred to New York, he alone slipped through the cracks in the reorganization and was discharged. Of all the workers shuffled in these different respects, Rottersman was the oldest.

The inability of CBS to account for who made the decision to fire Rottersman and on what grounds the decision was made emphasizes the unjustified nature of Rottersman's discharge. None of the five executives who would be expected to make such decisions knows anything about the decision to fire Rottersman, including Samuel Burger, the man who actually informed Rottersman. Burger's posture is made more dubious when his prior statements to Rottersman concerning his age and potential retirement are considered.

CBS hired William Almroth at about the time of the reorganization to administrate the manufacturing division from New York. Rottersman contends that Almroth took over many of his functions, such as acting as a liaison with regional plant managers, and that his credentials are nearly identical to his own. There are not enough facts before the Court to conclude that Almroth, a younger man, was hired to take over Rottersman's job. Yet the hiring of Almroth during a period of economic retrenchment does increase the weight of circumstances creating an inference of age discrimination.

Defendant's attempted justifications for Rottersman's layoff do not defeat plaintiff's prima facie case. Contraction in the record industry did indeed occur following the sales booms of the 1960s and 1970s, and it is likely that the closings of the three CBS regional plants were due to reduced consumer demand. But the effects of these economic changes on the Milford facility and on staffing decisions there are less clear. Neither the Cresap Report nor the CBS Memorandum of May 7, 1984 set out a well-defined program of restructuring which adequately explains business reasons for Rottersman's dismissal.

In *Vaughn v. Mobil Oil Corp., supra,* 708 F.Supp. 595, the defendant corporation reorganized itself in a similar fashion as did CBS Inc. in the case at bar. Personnel was moved between company locations, and new hiring was all but stopped. Two employees in the protected age group were laid off, and the defendant made two unsuccessful attempts to relocate one of them. *Id.* at 598. On these facts, Judge Walker held that the plaintiffs had presented evidence which would permit a reason-

able trier of fact to find that age discrimination had occurred. *Id.* at 600–01.

In the *Montana* case, the plaintiff's job responsibilities were not eliminated but were transferred to a newly hired, younger employee. The plaintiff was not offered the position of the new employee. *Montana, supra,* 869 F.2d at 105. The Second Circuit reversed the district court's grant of summary judgment for the defendant and held that the plaintiff had established a prima facie case of age discrimination.

This Court finds that the facts of the instant case are substantially similar to the facts of *Vaughn* and *Montana.* In addition, other suspicious circumstances—the statements made by Samuel Burger to Rottersman, the unwillingness of any CBS executive to take responsibility for Rottersman's discharge, and the duplicitous conduct by Korchin and Burger in attempting to compel Rottersman to sign a release—increase the strength of Rottersman's prima facie case.

### C. Statute of Limitations

The ADEA incorporates the statute of limitations provisions of the Portal-to-Portal Act of 1947, 29 U.S.C. §§ 255, 259, in creating a two-tier system of limitations periods. 29 U.S.C. § 626(e). Lawsuits alleging non-willful violations of the ADEA must be brought within two years of the plaintiff's discharge, while willful discharge actions may be brought up to three years after discharge. Since Rottersman was discharged on November 12, 1984 and did not file this lawsuit until November 5, 1987, CBS argues that the complaint should be dismissed as it was brought after the two-year statute of limitations had expired.

On April 7, 1988, the President signed the Age Discrimination Claims Assistance Act, Pub.L. No. 100–283, 102 Stat. 78 (1988) (the "Claims Assistance Act"). The Claims Assistance Act increased the applicable statute of limitations for certain ADEA lawsuits due to the tardiness of the EEOC in processing age discrimination complaints. Section 3 of the Claims Assistance Act allowed an "aggrieved person" to bring an ADEA complaint in federal court within 540 days of April 7, 1988 if certain requirements were met. First, the plaintiff had to file a timely complaint with the EEOC. Second, the EEOC must have failed in eliminating the alleged unlawful practice or in notifying the plaintiff of his right to bring a civil action. Third, the applicable statute of limitations period must have expired before the passage of the Claims Assistance Act. Fourth, neither the EEOC nor the plaintiff could have brought a civil action before the limitation period expired.

CBS does not contest Rottersman's assertions that all of these requirements have been fulfilled. Instead, CBS argues that Section 4 of the Claims Assistance Act, which requires the EEOC to notify the plaintiff within 60 days of April 7, 1988 of his rights under the ADEA, must be satisfied before a plaintiff may extend the limitations period under Section 3. CBS argues that since the EEOC did not follow this mandated procedure, Rottersman cannot avail himself of the benefits of Section 3 of the Claims Assistance Act.

The Claims Assistance Act was meant to protect a limited class of ADEA plaintiffs against EEOC tardiness. Its provisions should not be interpreted as enlarging the ways in which EEOC negligence can prejudice ADEA plaintiffs. It is true that the EEOC has violated its mandated duty under Section 4 of the Claims Assistance Act by not properly notifying Rottersman of his rights under the ADEA. But it is unrealistic to believe that just because the EEOC violated one section of the Act, plaintiff Rottersman, who was independently fully aware of his rights under the ADEA, should not be able to take advantage of the increased statute of limitations of another section. Congress could not have intended that the notice requirements of Section 4 are yet an additional prerequisite to the rights conferred on ADEA plaintiffs by Section 3.

### CONCLUSION

Plaintiff's motion to strike defendant's third affirmative defense concerning the applicable statute of limitations is granted.

Defendant's cross-motion for summary judgment is denied.

SO ORDERED.