William C. WILLIAMS, Plaintiff,

v.

**BROOKLYN UNION GAS
CO., Defendant.**

No. CV–88–2988.

United States District Court,
E.D. New York.

April 22, 1993.

Scott J. Steiner, New York City, for plaintiff.

Cynthia Boyer Okrent, Cullen & Dykman, Brooklyn, NY, for defendant.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

Plaintiff brings this action under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the New York State Human Rights Law, Exec.L. § 296, against his former employer the Brooklyn Union Gas Company. Currently before this court is defendant's motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Defendant argues that plaintiff has neither proved a prima facie case of age discrimination nor shown that Brooklyn Union's legitimate reasons for terminating his employment were pretextual. Plaintiff cross-moves to amend his complaint to state claims for compensatory and punitive damages under the Civil Rights Act of 1991. For the reasons provid-

ed below, plaintiff's motion to amend is denied, and defendant's motion for summary judgment is granted in its entirety.

## FACTS [1]

Most of the facts of this case are not in dispute although the parties draw vastly different conclusions from those facts. Plaintiff Williams commenced his employment with the Brooklyn Union Gas Company ("Brooklyn Union" or the "Company") in 1958, as a clerk in the Company's mailroom. With the exception of two years of military service, Williams worked for Brooklyn Union continuously until March 4, 1986, the date on which he was discharged. After approximately one year in the mailroom, Williams was transferred to the reproduction section where he worked as a machine operator. In 1971, the "head operator" of reproduction died, and Williams was promoted to that managerial position; reproduction—which consisted of three machine operators and a head operator—was then part of Brooklyn Union's Construction Department. In 1974, Williams's title was changed at his request to "supervisor of reproduction," but his responsibilities and salary remained the same. (Williams Dep. at 18–20, 26–29)

In April of 1984, Brooklyn Union transferred its reproduction section from the Construction Department to the Data Processing Operations Department ("Data Processing"). Data Processing was under the supervision of Michael J. Finnegan, Jr., director of data services. Finnegan also supervised the electronic accounting machines/microfilm ("EAM/microfilm") and the input/output control sections, both of which were run by supervisors over the age of 40. (Williams Aff. ¶ 5; Finnegan Reply Aff. ¶ 3) Finnegan reported directly to Stuart Sugarman, manager of Data Processing.

In late 1984, Brooklyn Union—in accordance with a suggestion from Finnegan and Sugarman—decided to combine its EAM/microfilm and reproduction sections under a single supervisor, thereby eliminating one supervisory position. (Finnegan Aff. ¶¶ 3–4; DX J) [2] In January of 1985, at approximately the same time that this decision was made, Williams was on medical leave for a recurring back condition. (Williams Aff. ¶ 11) Williams received a note from his doctor confirming his illness as the basis for his absence during this period. (PX 15) [3]

On February 4, 1985, the day that Williams returned from sick leave, he was advised of the reorganization and informed that Vincent Mancuso had been appointed supervisor of the combined staff. (Finnegan Aff. ¶ 5; Williams Aff. ¶ 12) Williams also was told that he would not receive an expected and previously approved merit raise. (Williams Aff. ¶¶ 9–10, 12; Steiner Aff. ¶ 11 & n. 3) At that time, plaintiff was forty-eight (48) years of age and Mancuso was fifty-eight (58) years of age. (Finnegan Aff. ¶ 4) As already mentioned, Finnegan and all the Data Processing supervisors who reported to him also were over the age of forty at this time. (Finnegan Aff. ¶ 1; Finnegan Reply Aff. ¶ 3)

The Company's reasons for choosing Mancuso over Williams were "his technical experience coupled with a superior attitude towards providing service to users." (DX J) Brooklyn Union documents a series of occurrences prior to the reorganization that, they argue, demonstrate Williams's poor performance and attitude. As the discussion below makes clear, Williams does not deny that these events took place but rather asserts that the Company—and especially his supervisor—misrepresents the events' significance. This court summarizes these events and,

---

1. PX and DX refer respectively to plaintiff's and defendant's exhibits submitted in connection with the motion for summary judgment. "Williams Dep." refers to the Deposition of William C. Williams, taken on April 17 and 18, 1990, and attached as DX E.

2. Finnegan was approximately forty-eight years of age when he recommended this consolidation. (Finnegan Aff. ¶ 1)

3. The precise dates of his absence were January 4–21 and January 28–February 4, 1985. The Company's Worker's Compensation doctor reported that plaintiff would be able to resume work on January 7, 1985. (Finnegan Reply Aff. ¶ 9 & Exh. K)

where relevant, highlights any factual or interpretative disputes:

(1) For approximately five or six years—during the time that reproduction was part of the Construction Department—Williams received "good" performance ratings from his supervisor Thomas J. Iervolino, assistant manager of the Construction Department. Under the Company's rating system, "good" is the lowest rating in the range of acceptable performance. Williams complained to Iervolino about one of these ratings and his corresponding salary increase; when Iervolino refused to change the ratings, Williams complained to Iervolino's newly appointed supervisor Mr. Bill Ferrado. (Williams Dep. at 31–34, 50–54, 219–21; Finnegan Aff. ¶¶ 2, 6) Williams does not contest any of the above but submits letters, reports, and audits reflecting the generally positive feedback that he and the reproduction section received between the years 1971 and 1984. (Williams Aff. ¶¶ 6–7; Steiner Aff. ¶¶ 7–9; PX 2, 4–5; but see Finnegan Reply Aff. ¶ 10)

(2) When reproduction was transferred to the Data Processing Department, Williams was given additional responsibility over eleven convenience copiers located throughout Brooklyn Union's corporate headquarters. Williams nevertheless did not receive a corresponding salary increase. When he complained of not receiving a raise, Finnegan explained that Williams's "hay points" had been increased. (Williams Dep. at 64–68; Williams Aff. ¶ 5; Finnegan Aff. ¶ 6). The hay points in a position affect the maximum salary level for that position.

(3) In June of 1984, soon after reproduction became part of Data Processing, Finnegan instructed Williams to give special priority to the above-mentioned convenience copiers and to check the convenience copiers daily. (Williams Dep. at 98–112) Williams already was in the practice of personally checking the copiers twice a week. Finnegan's reason for asking Williams to devote more personal attention to the copiers was so that Williams would be visible and accessible to people on the floor each day. (Williams Dep. at 102–05) Reluctant to follow Finnegan's request, Williams explained that in his opinion "it wasn't necessary for me to go five days." (Williams Dep. at 105) He complained to Sugarman, Finnegan's supervisor, who directed him to do as Finnegan asked. (Williams Dep. at 124–28) [4]

(4) Williams failed to comply with Finnegan's instructions that he personally pick up, fill out, and return an evaluation form for Jim McCafferty, one of his machine operators. Williams had McCafferty himself pick up the blank evaluation form. When Finnegan called and expressed his dismay, Williams responded "What's the big deal? ... All he was doing was picking up a blank piece of paper." (Williams Dep. at 116) Williams then entrusted the completed form to Mr. Murray, another operator, explaining that he wanted Murray "actually to see that I gave Jim a good reference":

Q: You wanted Mr. Murray to see what you wrote in the evaluation of Mr. McCafferty?

A: Yes.

Q: Why didn't you just show it to him then?

A: Well, that is one way of putting it, but I chose the other way.

Q: You figured that Mr. Murray would look at it when he carried it to Mr. Finnegan?

A: Yes.

Q: Do you think it's appropriate for one employee to see an evaluation of another employee?

A: Yes, when they are leaving like that, I see nothing wrong with it especially if you are giving a good evaluation.

Q: Did you show Mr. Murray the evaluation?

A: I handed it to him.

4. Williams also failed to assist two employees who were having trouble with the copiers. Although he asserts that his directing those employees elsewhere accorded with Finnegan's instructions, his actions resulted in complaints to Finnegan by these employees. (Williams Dep. at 106–12; Finnegan Aff. ¶ 7)

Q: Did you show Mr. McCafferty the evaluation?

A: No.

(Williams Dep. at 115–28; *see also* Williams Dep. at 207–08; Finnegan Aff. ¶ 8) Finnegan again called and asked Williams why he did not personally return the completed form. During both of Finnegan's calls, Williams inquired of his supervisor whether they would "have to see Sugarman on this." (Williams Dep. at 116, 120)

(5) After a two-week absence from work, Williams gave the following response to Finnegan's request that Williams consult the Company doctor:

Q: What did Mr. Finnegan say to you?

A: To go and see the company doctor.

Q: What did you say to him?

A: What was the purpose of going to the company doctor?

Q: What did he say?

A: Company policy?

Q: What did you say?

A: I said it's not company policy, it's not a long term illness. He said it was. I said it's not. He said I want you to go see the doctor.

Williams did consult the Company doctor who refused to examine him since the injury was one involving compensation claims. (Williams Dep. at 158–61)

(6) When Finnegan asked Williams to attend a business meeting on Long Island, Williams complained about having to take the Railroad to the meeting, (Williams Dep. at 236–42; Finnegan Aff. ¶ 10), explaining as follows:

A: I mentioned to Mr. Sugarman that Mr. Finnegan had me going all the way out to Long Island and I had to travel all the way from Flatbush to the L.I.E., which was taking me the long way around. I was riding on a train, I didn't even know where I was going. The salesman volunteers to pick me up, which would have been more convenient, but it was unacceptable to Mr. Finnegan, because that would be putting him at an inconvenience because he, I think to the best of my recollection, Mr. Finnegan didn't want to come into Brooklyn Union Gas Company. He wanted to stay close to his house.

Q: It became a question of who would be more inconvenienced you or Mr. Finnegan?

A: I don't know. I'm just talking about myself.... I believe Mr. Finnegan said it would be more convenient for him.

Q: Did you have a problem with that?

A: Yes, I had a problem.

Q: Why? What was your problem with that?

A: I had to travel halfway around Brooklyn when I would rather go straight to Brooklyn Union Gas and have the individual pick me up. That would have made it nice and easy for me. We could have also picked up Mr. Finnegan if he wanted to stay out in Long Island and not report to Brooklyn Union Gas Company. We could have picked him up out there.

(Williams Dep. at 240–41) As mentioned, the Company cites these incidents to illustrate why Mancuso was appointed to supervise the newly consolidated reproduction and EAM/microfilm section. At the time of the consolidation, Finnegan recommended terminating Williams's employment with Brooklyn Union altogether; due to plaintiff's many years of service, the Human Resources Department decided to locate another job for him with the Company and asked Data Processing to retain him in the interim. (Finnegan Reply Aff. ¶ 4)

The parties disagree on the steps that the Company took to find Williams another position following the consolidation. Brooklyn Union characterizes itself as actively seeking to relocate Williams within the Company while, in the interim, employing him in the Data Processing Department updating and reorganizing the technical library. Williams claims that Brooklyn Union, in an attempt to humiliate and degrade him, assigned him menial tasks—such as lifting boxes and filing microfiche—and housed him in the third-floor hallway at the Company's corporate headquarters. Not in dispute, however, is the fact that during the period that Williams

remained in Data Processing, he and Finnegan continued to disagree on what constituted appropriate behavior on behalf of employee and employer.[5]

On May 29, 1985, Williams wrote a letter to Mr. Larson, Brooklyn Union's president, complaining of his current work situation. (Williams Dep. at 242; Williams Aff. ¶ 19–20; PX 16) Larson replied on June 6, 1985, informing Williams that he had asked the Human Resources Department to "look into the matter." (PX 17) On June 29, 1985, Williams met with Thomas M. DeMartino, assistant vice president of Human Resources. DeMartino informed Williams that his recent attitude towards his supervisors had been unacceptable and, if it continued, would result in his discharge. (Williams Dep. at 249–50, 256) A memorandum memorializing that meeting states as follows:

> Mr. DeMartino opened the meeting by stating to Mr. Williams that because of his poor performance relating to instances of insubordination and non-productivity, he was on the verge of being discharged from employment with this Company.... Mr. Williams responded by stating that he felt that he has been an extremely productive and efficient employee in all his years of service in the Company. It was pointed out to him that a number of his past supervisors did not agree with this and there have been a number of problems of poor performance in the past. At this time, Mr. Williams was informed that we are not proceeding with discharge but instead we are offering him a job position as an Assistant Supervisor in the Mail Room of the Credit & Commercial Service Department. *Should Mr. Williams accept this job position it was emphasized that his job performance must be acceptable in every respect and should there be any problems regarding his job performance it must be clearly understood that he is subject to termination of employment without any second chance what-so-ever.*

(PX 8) (Emphasis added) Williams accepted this new position.

As an assistant supervisor of the mailroom, Williams supervised eleven employees and received the same salary that he had earned as supervisor of reproduction. (Williams Dep. at 258; Valentine Aff. ¶¶ 1, 2) He reported to David Ripple, operations supervisor, who in turn reported to Norman Valentine, director of the mail and payment processing section.[6] (Valentine Aff. ¶¶ 1, 2) At

---

**5.** Williams summarizes his version of what occurred during the interim time period as follows:

Q: In what way or manner were you being unfairly treated?

A: With the conduct that I was receiving from Brooklyn Union. For example, I was denied an increase that had previously been approved. I got two very good recommendations from Brooklyn Union Gas Company. One from Mr. Finnegan saying that I came out smelling like a rose, yet when I was out sick, he denied me my sick time after 27 years. I believe I had 28 weeks sick time due to me as far as company policy was concerned, yet I was only out two weeks. Mr. Finnegan denied me pay for those two weeks. Mr. Finnegan removed me from my job. Mr. Finnegan had refused me a chair to sit on when I had problems with my back. Mr. Finnegan refused me a note from a doctor to allow me to walk around for ten minutes. Mr. Finnegan had me working in the hall, degrading me, opening boxes, putting cabinets up. Mr. Finnegan had me by the bathroom, ladies' and men's, and asking me to do work, and I had no work to do. The whole thing was just a little too much for me.

(Williams Dep. at 245–46)

Finnegan claims that during the interim period Williams took coffee breaks at a restaurant across the street, spent excessive time reading the newspaper during working hours, and stared out the window for extended periods. (Finnegan Reply Aff. ¶ 6) Williams confirms that this behavior occurred but attempts to justify it. For example, he explains the restaurant trips as necessitated by the fact that, unlike other workers, he did not have a desk where he could sit and enjoy his coffee; he also explains that his back condition required that he stand or walk for ten minutes each hour. As for reading and looking out the window, Williams states that these activities stemmed from his boredom at the menial tasks assigned to him; he also contests Finnegan's assertion that his work was not finished. Finally, Williams claims that other employees were allowed to engage in the behavior for which he was chastised, although he admits that others in his particular department did not engage in such behavior. (Williams Dep. at 246–49)

**6.** Valentine reported to Joseph Galimi, Manager of the Credit and Commercial Services Department. Galimi was later replaced by Robert P. Moore.

their respective depositions, Williams and Valentine each testified that they greeted this new working relationship with a positive attitude. (Williams Dep. at 258; Valentine Dep. at 44)

A series of events thereafter occurred, culminating in plaintiff's discharge from Brooklyn Union approximately six months after assuming his new position. Although the parties once again dispute the conclusions to be drawn from these events, they agree on the material facts as follows:

(1) The first incident involved a union employee from the meter reading department who was temporarily assigned to the mailroom because of an injury. Finding that this employee was not an asset to the mailroom, Williams asked that the meter reader be returned to his department. (Williams Aff. ¶ 30) Ripple directed Williams to submit a report regarding any misconduct by this employee, but Williams did not do as requested. (Valentine Reply Aff. ¶ 3; Williams Aff. ¶ 31) Williams does not deny that he was asked to prepare the report nor that he failed to do so; rather, he testified that he "didn't think it was—to my opinion it wasn't worthwhile to write up a memo." (Williams Dep. at 348) He explains further that he did not wish to misrepresent the employee's behavior since it was the light-duty status and not some misconduct that made the employee unsuitable for mailroom work. (Williams Dep. at 347–49; Williams Aff. ¶ 31; Valentine Aff. ¶ 3)

(2) Valentine directed Williams to implement a control procedure for priority mail following an incident in which a priority item from the Company's Treasury Department had not been timely mailed, thereby causing financial loss to Brooklyn Union. (Williams Aff. ¶ 33) Brooklyn Union asserts that "Mr. Williams, however, failed to comply with Mr. Valentine's instructions and, when confronted, blamed his assistant Mr. Reilly." (Valentine Aff.

¶ 3) Although Williams did implement a priority mail system, he claims that Reilly failed to log in a piece of mail pursuant to that procedure. (Williams Aff. ¶ 33) Reilly, although holding the same title as Williams, was placed in the mailroom to assist Williams. (Valentine Reply Aff. ¶¶ 2, 4) Williams confirms this hierarchy in his affidavit, by stating that he had complained to supervisors of having "no power over Reilly, even though he was, in theory to report to me." (Williams Aff. ¶ 25)

(3) In February of 1986, Valentine instructed Williams to mail certain letters in unmarked envelopes. In response to Valentine's inquiry concerning why this procedure was not conducted, Williams claimed that Ripple had told him not to do so. Ripple denied giving any such direction. (Williams Dep. at 349–51; Williams Aff. ¶; Valentine Aff. ¶ 4)

(4) Williams improperly recorded his overtime on Company records by indicating on his time sheet that he had worked thirteen hours when, in fact, he had worked for twelve hours and thirty-seven minutes. He explained that he had filled out his time sheet to reflect the fact that he had not taken a break, claiming that this procedure was taught to him by one of his predecessors and was used by all Company employees who work overtime. (Williams Dep. at 311–20; Valentine Aff. ¶ 5; Williams Aff. ¶ 34) At no time, however, did Williams inform his supervisors that he was recording his time in this manner or was leaving early. Reprimanded by Valentine the following day, Williams nevertheless left early the following night. (Williams Dep. at 319–20)

Brooklyn Union discharged Williams on March 4, 1986. Valentine and Moore explained to Williams in detail the reasons for the discharge.[7] They also told Williams that if he resigned, the Company would assist him

---

7. As Williams explains in his NYSDHR complaint:

> I was told by Robert Moore (younger) Manager, of Credit and Commercial Department That my work was unsatisfactory and the reasons given were I went home twenty three minutes

early, a piece of mail was not signed properly, I made a mistake on the JV 51 form: took my wife home sick did not return to work, and did not have figures for Mr. Bob Duffy.

(DX H)

in finding new employment through a placement service and would continue paying his salary for three months; Williams refused this offer because he believed that he had not done anything wrong. (Williams Dep. at 365–68) Citing all of the foregoing incidents, the Company explains that its decision to discharge Williams resulted from his unacceptable performance and attitude. Williams, in contrast, maintains that his mailroom position "was little more than a staging area for [his discriminatory] discharge" and that Brooklyn Union "used Mr. Williams' presence in the mail room in order to document a series of pretexts by which they would discharge him."

To complete this discussion of facts, it is important to document who replaced Williams in the mailroom after his departure from Brooklyn Union. Immediately following the discharge—from March to April of 1986—Reilly, age forty-two, took over supervision of the mailroom. In April of 1986, the Company assigned Robert Rooney to this position; Rooney, a manager of word processing and mail services in the Credit and Commercial Services Department, was forty-six years of age and had been a Company supervisor since 1969. Frank Zychowski, a thirty-seven-year-old supervisor from another department, replaced Rooney. Zychowski was subsequently replaced by Robert Fitzgerald, a forty-nine-year-old supervisor who ran the mailroom from March until August of 1987. (Valentine Reply Aff. ¶ 7) In August of 1987, Massaro, age thirty-two, became acting supervisor of the mailroom under the Credit and Commercial Services Department Management Evaluation Program ("MEP"); he was promoted to assistant supervisor of the mailroom in February of 1988. (Valentine Reply Aff. ¶ 10)

Massaro began working for the Company in 1975 as a machine operator in the mailroom. (Valentine Reply Aff. ¶ 8) In 1980, he was promoted to commercial clerk in the mail and payment processing section of the Credit and Commercial Services Department. In April of 1986, he was assigned to assist Rooney and then Zychowski in the mailroom; in May of 1986, Massaro was selected to participate in the MEP. (Valentine Reply Aff. ¶¶ 8–9) A participant in this program is given supervisory responsibilities— as an acting supervisor—in a variety of positions. (Valentine Reply Aff. ¶ 9) From the fall of 1986 through May of 1987, Massaro was assigned to different areas in the Credit and Commercial Services Department. From May of 1987 through August of 1987— immediately prior to his appointment as acting mailroom supervisor—he worked in Queens as an acting supervisor in meter reading. Massaro was promoted to assistant supervisor in February 1988, after a successful performance in the MEP. (Valentine Reply Aff. ¶ 10 & Exh. L)

## PROCEDURAL HISTORY

On the same day that Williams was discharged—March 4, 1986—he filed a complaint with the Workers' Compensation Board claiming that his employer had violated Section 120 of the New York Workers' Compensation Law. Specifically, Williams alleged that Brooklyn Union had discharged him in retaliation for his having filed a Workers' Compensation claim for his back injury. The Board dismissed his complaint on September 24, 1987, stating in its Memorandum of Decision:

> After careful consideration of all the evidence of record, I find the employer did not violate section 120 of the Workers' Compensation Law. The complaint is dismissed. Case closed.

(DX F) The New York State Department of Labor also considered Williams's discharge. Administrative Law Judge Kaufman issued a decision on August 8, 1986, finding that Brooklyn Union's articulated reason for plaintiff's dismissal—"that plaintiff was discharged for poor attitude, poor performance and the exercise of poor supervisory judgment"—was not grounds for denying him unemployment benefits. (DX G)

On March 10, 1986, Williams filed a complaint with the Equal Employment Opportunity Commission ("EEOC") charging that defendant had discriminated against him in violation of the ADEA. (Complaint ¶ 5; DX H) The EEOC referred this complaint to the New York State Department of Human Rights ("NYSDHR"). On November 29,

1990, the NYSDHR dismissed these discrimination charges on the grounds of "administrative convenience" based on the pendency of Williams's federal action. (DX H) In April of 1987, Williams commenced an action in New York State Supreme Court, Kings County. The state case, which is still pending, accuses Brooklyn Union of wrongfully discharging plaintiff for filing a Workers' Compensation claim and of intentionally inflicting emotional distress on him. (DX C)

Williams commenced this federal action on September 28, 1988, approximately three-and-a-half years after the Data Processing consolidation and two-and-a-half years after his discharge from Brooklyn Union. His complaint alleges claims of age discrimination, retaliatory discharge, and intentional infliction of emotional distress. The complaint originally alleged a violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), but Williams stipulated to a discontinuance of this cause of action on April 17, 1990. (Exh. I) Bearing in mind the factual and procedural histories of this case, this court now turns to the two motions at issue.

## DISCUSSION

### I. *Plaintiff's Motion to Amend Complaint*

■ The denial or grant of a motion to amend is within the discretion of the district court, *Evans v. Syracuse City School Dist.*, 704 F.2d 44, 46 (2d Cir.1983) (citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962)), and leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). In *Foman*, the Supreme Court instructed that leave to amend was to be liberally granted absent "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Foman*, 371 U.S. at 182, 83 S.Ct. at 230.

■ As mentioned above, plaintiff in this case moves to amend his complaint to state claims for compensatory and punitive damages under Section 102(b) of the Civil Rights Act of 1991. Since plaintiff's cause of action arose prior to Congressional enactment of that statute, the viability of his motion depends on this court finding that the 1991 Act applies retroactively. In *Hill v. New York City Board of Education*, 808 F.Supp. 141 (1992), this court joined the majority of its sister courts in declining to make such a finding, instead determining that the Act applies prospectively only. On March 24, 1993, the Second Circuit agreed with this conclusion.[8] *See Butts v. New York Dep't of Housing, Preservation and Dev.*, 990 F.2d 1397 (2d Cir.1993). Accordingly, the claims that plaintiff seeks to add to this action through his amended complaint are "futile," and, in accordance with *Foman*, his motion to amend must therefore be denied.

### II. *Defendant's Motion for Summary Judgment*

#### A. *Age Discrimination*

The Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1), provides that it is unlawful for an employer

> to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.

All employees who are at least forty (40) years of age are protected by this statute. 29 U.S.C. § 631(a). The ADEA specifically provides that it is not unlawful for an employer to base its decision on "reasonable factors other than age," or to discharge an individual "for good cause." 29 U.S.C. § 623(f)(1), (3).

■ The same pattern of proof that applies to federal employment discrimination cases also applies to claims brought under the ADEA. *Montana v. First Federal Sav.*

---

**8.** This question is now before the Supreme Court in two consolidated cases. *See Harvis v. Roadway Express, Inc.*, 973 F.2d 490 (6th Cir.1992), *cert. granted in part*, —— U.S. ——, 113 S.Ct. 1250, 122 L.Ed.2d 649 (1993), and *Landgraf v. USI Film Products*, 968 F.2d 427 (5th Cir.1992), *cert. granted in part*, —— U.S. ——, 113 S.Ct. 1250, 122 L.Ed.2d 649 (1993).

*& Loan Ass'n*, 869 F.2d 100, 103 (2d Cir. 1989); *Pena v. Brattleboro Retreat*, 702 F.2d 322, 323–24 (2d Cir.1983). That well-known pattern—established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981)—requires proof as follows: (1) the plaintiff-employee must establish a prima facie case of discrimination; (2) the defendant-employer then must articulate a legitimate non-discriminatory reason for the employment action; (3) the burden then shifts back to plaintiff to prove by a preponderance of the evidence that the legitimate reasons were a pretext for discrimination. *See Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir.1991) (discussing plaintiff's burden of proof for summary judgment motion in age discrimination case).

■ While age discrimination claims often require a determination of a party's intent—normally not a subject for summary judgment—the Second Circuit has recognized that "the salutary purposes of summary judgment … apply no less to discrimination cases than to commercial or other areas of litigation." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). Thus, the familiar standard of Rule 56 governs and instructs that summary judgment is appropriate when there is no genuine issue of material fact and the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Furthermore, although a nonmoving party is entitled to have a court resolve all reasonable ambiguities and inferences in his favor, "Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim." *Bay*, 936 F.2d at 116; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (summary judgment appropriate against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden

of proof at trial"). Thus, in age discrimination cases, summary judgment is appropriate when a plaintiff has failed to establish prima facie discrimination or has failed to provide sufficient evidence to allow a rational jury to find that the legitimate non-discriminatory reasons offered by the employer were pretextual. *Maresco v. Evans Chemetics*, 964 F.2d 106, 110 (2d Cir.1992); *Bay*, 936 F.2d at 116–17; *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1113–14 (2d Cir.1988); *Meiri*, 759 F.2d at 995–97.

### 1. *Prima Facie Case*

■ To state a prima facie case of discrimination, a plaintiff must show that he: (1) was a member of a protected class; (2) was qualified for the position from which was discharged; (3) was discharged; and (4) the discharge occurred in circumstances giving rise to an inference of discrimination. *Rosen v. Thornburgh*, 928 F.2d 528, 532 (2d Cir. 1991); *Meiri*, 759 F.2d at 995. Although plaintiff's burden of proof at this initial stage of a discrimination case is far from onerous, *Dister*, 859 F.2d at 1114 ("The nature of a plaintiff's burden of proof at the prima facie stage is *de minimus.*"), he nevertheless must provide some evidence—direct or circumstantial—to survive a motion for summary judgment. *See Stanojev v. Ebasco Services, Inc.*, 643 F.2d 914, 921 (2d Cir.1981) (plaintiff may raise inference of age discrimination or by providing direct proof of age discrimination, statistical proof, or circumstantial evidence, such as preference for younger employees in defendant's organization or by demonstrating replacement by younger employee); *Littman v. Firestone Tire & Rubber Co.*, 709 F.Supp. 461, 465 (S.D.N.Y.1989) (same) (*citing Montana*, 869 F.2d at 104 and *Meiri*, 759 F.2d at 995).

Williams easily satisfies the first and third elements required to prove a prima facie case of age discrimination, for he was over forty years of age when the allegedly discriminatory discharge took place. Leaving aside the question of whether he was "qualified" for the position from which he was terminated, an issue disputed by the parties, this court turns to the fourth element. Williams urges

this court to infer age discrimination based on the following:

despite the fact that the plaintiff had always received good performance reviews and was a gifted printer, [Brooklyn Union] made no attempt to find a position for plaintiff; [Brooklyn Union] placed plaintiff in a hallway and gave him no work whatsoever to do, except lift heavy boxes[;] after several weeks, plaintiff was assigned the task of filing microfiche in the third floor hallway; during this time, Plaintiff was prohibited from following his doctors advice and walking for ten minutes each hour; after plaintiff wrote to the president of [Brooklyn Union] complaining of his situation, he was given a "last change" and demoted to the mail room as an assistant supervisor. At all times while plaintiff was assistant supervisor, another assistant supervisor worked alongside plaintiff, in a parallel function. While in the mail room memos regarding plaintiff were written on a regular basis.

(Plaintiff's Memorandum of Law in Opposition to Motion for Summary Judgment at 8)

■ As an initial matter, plaintiff's age, standing alone, is insufficient to satisfy his burden of proof. *Littman v. Firestone Tire & Rubber Co.*, 709 F.Supp. 461, 465 (S.D.N.Y. 1989); *see also Corcoran v. GAB Business Services, Inc.*, 723 F.Supp. 966, 968–69 (S.D.N.Y.1989) ("Other than two isolated comments about his age by individuals who plaintiff admits had nothing to do with the decision to terminate him, plaintiff offers nothing more than the single fact that he was terminated at the age of sixty-one as evidence of any age discrimination. Neither the comments nor plaintiff's age alone is sufficient to establish an inference of discrimination.").

Nor does plaintiff offer any direct evidence of age discrimination, as his own deposition testimony confirms:

Q: Why did you think you were being fired based on age discrimination?

A: I was doing a fabulous job. There was not reason for me—*there was no other reason justifiable that they would fire me.* To know there was no conduct that I did that I should have been fired for.

Q: Are there any other facts that you are aware of that led to your belief that you were fired for age discrimination other than you were doing a fine job?

A: No, I don't know the reason.

Q: Did anybody ever say anything to you that led you to believe you were a victim of age discrimination?

A: No.

Q: Who at the company do you claim discriminated against you on the basis of age? . . .

A: To my knowledge, I don't know.

Q: You don't know.

A: I don't know.

Q: Can you tell me in what manner they discriminate against you on the basis of age?

A: By firing me.

(Williams Dep. at 372–73) (emphasis added).

■ Furthermore, the undisputed evidence in this case, established through depositions and affidavits based on personal knowledge, shows that the Brooklyn Union employees in any way responsible for the events that led up to plaintiff's discharge were his age or older. With respect to plaintiff's treatment while he worked in the Data Processing Department, Mancuso, the first employee to receive a promotion over Williams, was ten years his senior, and Finnegan, the supervisor with whom plaintiff had the above arguments and who recommended the consolidation that led to Mancuso's promotion, was over forty. Although a discharged employee in a reduction-in-force or structural reorganization case need not show replacement by a younger, newly hired employee, *Montana*, 869 F.2d at 105, the evidence described above certainly is pertinent to assessing the merits of plaintiff's age discrimination claims. *See Bay*, 936 F.2d at 118 (finding fact that company retained three older employees relevant to plaintiff's age discrimination claim); *Meiri*, 759 F.2d at 996 ("[T]he fact that [plaintiff] was not replaced by a non-Jew—indeed, she was never replaced—*may weaken*, but certainly does not eliminate, the inference of discrimination.") (emphasis added).

Plaintiff's ultimate discharge from Brooklyn Union occurred under similar circumstances. Valentine, the supervisor who recommended that the Company terminate plaintiff's employment and who thereafter appointed supervisors to the mailroom, was approximately plaintiff's age. (Valentine Aff. ¶ 1) Williams argues that he ultimately was "replaced" by a "twenty-eight-year old with no management experience" which suffices to raise an inference of age discrimination. (Williams Aff. ¶ 36; Steiner Aff. ¶ 21) The factual underpinnings of this assertion are materially inaccurate. First, thirty-two-year-old Massaro had management training and experience in the mailroom. Second, he did not "replace" plaintiff but took over the mailroom nearly two years—and several supervisors—after Williams was discharged. In the interim, the position was held by supervisors who were approximately plaintiff's age or older.

Comparison of this case to two other age discrimination cases from this circuit—*Montana*, 869 F.2d at 100, and *Littman*, 709 F.Supp. at 461—is helpful to show that even Massaro's appointment fails to raise any inference of discrimination, despite the minimal burden of proof on this issue. In *Montana*, the case upon which Williams primarily relies for support, plaintiff—a vice president and thirty-year employee of the defendant Savings and Loan Association—was transferred to a new position following defendant's corporate merger. 869 F.2d at 102. A second restructuring took place approximately one year later, the result of which was to eliminate plaintiff's position and occasion her discharge. The district court found that plaintiff had proved a prima facie case of age discrimination but nonetheless granted defendant's motion for summary judgment, holding that plaintiff failed to produce sufficient evidence that her employer's reasons for discharging her were pretextual. *Id.* at

103. On appeal, the Second Circuit agreed that plaintiff had proved a prima facie case based on the following evidence and rationale:

There is no dispute over the first three elements [of proof]: at 56 years of age [plaintiff] was in the protected age group; she was qualified for her job; and she was discharged. As to whether the circumstances of her discharge raise a permissible inference of age discrimination, (1) the majority of her responsibilities were not eliminated, but were transferred to a twenty-six year old overworked coworker, Rossi; (2) shortly thereafter some of Rossi's responsibilities were transferred to another twenty-six year old woman hired as a compensation analyst; and (3) [Plaintiff] was not offered the position of either of these younger women. From this evidence a reasonable fact-finder could infer that [Plaintiff] was disadvantaged in favor of the younger employees, and thereby made a victim of age discrimination.

*Montana*, 869 F.2d at 105; [9] *see also Maresco*, 964 F.2d at 113 ("The record in this case suggests that although Evans' decision to consolidate the Darien and Lexington offices was fairly based upon economic considerations, upon consolidation, Evans was faced with a larger pool of employees than available positions. In these circumstances, Evans was entitled to allocate the accounting positions in accordance with its business judgment, but could not do so on account of employees' ages. The decision to terminate two of the three older accounting employees, and none of the twenty younger employees, presents circumstances which give rise to an inference sufficient to withstand a motion for summary judgment that age was impermissibly considered in allocating the post-consolidation employment positions.").

9. With respect to the issue of pretext, however, the circuit court found sufficient evidence to bar a grant of summary judgment. The court observed that the following six facts indicated that age might have factored into defendant's reorganization decision: plaintiff was the oldest and highest paid nonclerical employee in the personnel department; plaintiff was the only department head in that office whose position was consolidated; plaintiff was not offered an opportunity to transfer; plaintiff's duties were not eliminated but were transferred to a younger coworker; plaintiff was not considered for a newly formed, comparable position; and following the consolidation, which was justified as reducing the work force, defendant hired three additional employees in its personnel department. *Id.* at 105.

In sharp contrast to the material facts in *Montana*, nothing in Brooklyn Union's treatment of Williams raises an inference that age made the least bit of difference in the Company's employment decisions. After repeated incidents in which plaintiff contested his superiors' instructions or decisions, the Company—despite the recommendations of plaintiff's supervisor—not only considered Williams for a new position but in fact found one for him; that Brooklyn Union failed to do so immediately may have irritated plaintiff but certainly raises no inference of age discrimination. Rather, he and Finnegan continued in the same relationship that they had maintained since reproduction was transferred to Data Processing. Furthermore, despite warnings that his attitude toward his superiors had to change—warnings which this court finds justifiable given the undisputed facts provided above—Williams continued consistently to question, oppose, and disparage his supervisors' recommendations and requests. Notably, with the exception of Massaro, all other Brooklyn Union employees involved in this case were plaintiff's age or older. Finally, plaintiff refused to take responsibility for his behavior; on this point, plaintiff's testimony as to why he believes he was the victim of age discrimination is telling.

The facts of this case resemble the facts of *Littman*, 709 F.Supp. at 461, and a brief comparison to that case is instructive. In *Littman*, a sixty-five-year-old plaintiff employed by defendant for four years as a real estate negotiator and then discharged, commenced an action under the ADEA. He offered the following circumstantial evidence to defeat his employer's motion for summary judgment: his application for additional life insurance was misplaced; he did not know of any other persons over age sixty-five working for defendant; a co-worker had said that defendant should "get rid of the World War II vintage"; and defendant unreasonably failed to approve plaintiff's real estate deals. Based on that evidence, the court concluded as follows:

> [P]laintiff has failed to produce even a scintilla of admissible circumstantial evidence from which one could infer that age played any part whatsoever in defendant's

decision to discharge him. To the contrary, all available evidence points in the other direction. Defendant hired plaintiff when he was 61 years of age and offered him many chances to improve his performance and recordkeeping, over and over again giving him the benefit of the doubt. Plaintiff, in response to defendant's persuasive offer of proof, offers nothing more than conclusory statements of discrimination. It is abundantly clear that the age discrimination claim here is without merit.

*Id.* at 467. As in this case, plaintiff in *Littman* had once been cited by his employer as its "number one dealmaker," but had also exhibited "marked deficiencies" in performance, which were noted when a new manager for his region was appointed. Although Williams's submissions in opposition to summary judgment are more voluminous than were the submissions in *Littman*, their substance is comparable. Other than his being over forty, Williams points to no evidence of age discrimination; in contrast, Brooklyn Union has shown that it hired numerous employees over the age of forty and that it gave plaintiff opportunities to improve his attitude. Thus, the following language of the *Littman* court is applicable:

> Plaintiff here has shown that he is over 40 and thus belongs to the protected age group. Although plaintiff has perhaps shown that he was qualified to perform the job, he has not adduced a scintilla of any kind of evidence, whether circumstantial, direct, or statistical, from which a factfinder could infer that age played any part whatsoever in the employer's decision. Rather, he repeats conclusory statements of discrimination and urges this court to await his production of evidence at trial. Because principles of summary judgment require more than mere conclusory incantations of discrimination, plaintiff has failed to meet his burden on this motion.

*Id.* at 465.

Under the familiar standard of Rule 56, summary judgment is appropriate when there is no genuine issue of material fact. A "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. In order to raise such a dispute, the party opposing summary judgment must submit affidavits made upon personal knowledge and cannot rely merely upon denials of a general nature. Fed.R.Civ.P. 56(c); *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (court may grant summary judgment if evidence is "merely colorable" or "not significantly probative."); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts."). After reviewing the undisputed evidence in this case, this court finds that the circumstances leading up to plaintiff's discharge give no indication and permit no inference that age was a factor in the Company's employment decisions.

### B. *Valid, Non–Pretextual Reasons for Dismissal*

Even if this court were to find that plaintiff, under the deferential standards for establishing a prima facie case of discrimination, had satisfied his burden of proof, defendant has articulated legitimate non-discriminatory reasons for the actions it took. Furthermore, plaintiff has failed to provide any evidence that those reasons were pretextual "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095; *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir. 1989); *see also Dister,* 859 F.2d at 1115 ("[T]he evidence must—at a minimum—create a genuine issue of fact as to [defendant's] offered reasons or as to a discriminatory motive."). It is worthwhile to note that "[t]o a large extent . . . the strength or weakness of the inference of discrimination created by the employee's *prima facie* case defines the nature of the employee's rebuttal." *Meiri,* 759 F.2d at 997.

As an initial matter, nothing in connection with the Company's decision to consolidate the reproduction and EAM/microfilm sections, to appoint Mancuso, and to employ plaintiff in Data Processing during the interim period was pretextual. An internal memorandum written by Finnegan and Sugarman on January 23, 1985, (DX J), describes the reasons behind the decision to combine Brooklyn Union's reproduction and EAM/microfilm sections. That the sections were small, each having one supervisor and only three or four employees, and that the supervisors were not fully occupied supports the consolidation. Furthermore, the consolidation lowered operating costs by eliminating a supervisory position and facilitating even distribution of work between the departments, thereby reducing the need for overtime pay. Williams claims that because Brooklyn Union provides no data supporting this consolidation, the decision was pretextual. Courts must refrain from second-guessing an employer's business decisions or good faith business judgment unless an employee alleges that the demands were "illegal or arbitrary," *Meiri,* 759 F.2d at 995 (*quoting Kephart v. Institute of Gas Technology,* 630 F.2d 1217, 1223 (7th Cir.1980)), or not worthy of credence. *Montana,* 869 F.2d at 106. Williams provides no reason to question the legitimacy of Brooklyn Union's justifications, reflected in their contemporaneous memorandum, in support of the consolidation.

In addition, Brooklyn Union offers legitimate, non-discriminatory reasons for appointing Mancuso as the supervisor of the newly combined section. First, contrary to plaintiff's assertion that Mancuso lacked management experience, Mancuso, formerly supervisor of the EAM/microfilm section, held a managerial position comparable to that held by Williams. Second, Mancuso had been employed in the Data Processing Department for over 20 years—twice as long as plaintiff—and, while perhaps not as academically accomplished as Williams,[10] pos-

---

10. Williams has an associate's degree in graphic science from New York City Community College and a bachelor's degree in Business Administration from Baruch College. In addition, Williams completed courses in supervisory training and labor relations at Brooklyn Union. (Defendant's 3(g) Statement in Opposition, ¶ 3; Williams Aff. ¶ 3)

sessed technical knowledge of general data processing, computers, microfilm, and EAM equipment that Williams lacked. (Finnegan Aff. ¶ 4) Third, Mancuso's cooperative attitude supports his appointment; Williams, in comparison, disagreed with Iervolino, Finnegan, and Sugarman over performance ratings, salary increases, and work assignments. He does not dispute these disagreements although he argues that they do not show that he had an uncooperative attitude. Fourth, Mancuso was ten years Williams's senior. Williams claims that the Company's "decision to choose Mr. Mancuso over [him] was that, in so doing, because Mr. Mancuso was at that time 58, BUG would effect a net turnover of both older supervisors in relatively few years." (3(g) Statement in Opposition, ¶ 12(h)) However, he offers absolutely nothing other than a bald assertion to support his contention that appointing a fifty-eight-year-old employee to this position was part of a grand conspiracy to force older employees from the Company. In sum, this court finds nothing in the Company's initial employment decisions to bar a grant of summary judgment. *See Carlton v. Interfaith Medical Center,* 612 F.Supp. 118, 122–24 (E.D.N.Y.1985) (granting summary judgment where two intermediate supervisory positions consolidated into one position given to more qualified person).

 With respect to Brooklyn Union's treatment of plaintiff following the reorganization and leading up to his March 4, 1986 discharge from the mailroom, Williams acknowledges that all the aforementioned disagreements with supervisors indeed occurred, but he nevertheless asserts that defendant's decision to discharge him was partially related to an impermissible consideration—his age. *See Montana,* 869 F.2d at 105 (plaintiff must show not that employer's proffered reason was false, "but only that its stated reason was not the only reason and that her age did make a difference."). For support, he cites the sudden onset of the Company's negative treatment and its failure to give him an approved raise; the Company's failure to document any of his disagreements with supervisors until after the reorganization, (Steiner Aff. ¶ 16); the less-than-ideal interim position in which the Company

placed him, including the unreasonable restrictions on his behavior, (Steiner Aff. ¶¶ 24–28); and the Company's subsequent appointment of Massaro. In response, Brooklyn Union provides evidence—which features plaintiff's deposition testimony in a starring role—documenting a series of interactions between plaintiff and his supervisors. This evidence establishes that from the moment the Company transferred the reproduction section from the Construction Department to the Data Processing Department, if not before, Williams failed to respect his supervisors' requests and judgment; a reasonable person could not find anything sudden or unexpected in Finnegan's actions. Moreover, despite numerous incidents during which Williams was reprimanded for questioning or failing to follow his supervisors' express directions, he refused to modify his general conduct and continued to believe in the excellence of his work.

This case closely resembles a Seventh Circuit case entitled *Palucki v. Sears Roebuck & Co.,* 879 F.2d 1568 (7th Cir.1989). The plaintiff in *Palucki* had worked for the same organization for many years and, by the age of forty, had attained a supervisory position. As a result of a reorganization, plaintiff was named manager of a new division. Dissatisfied with the change and unable to adjust, plaintiff was fired for unsatisfactory performance after a year in his new position and was replaced by an employee in his early thirties. *Id.* at 1570. The district court granted summary judgment to the employer, and the Seventh Circuit affirmed. Based on the responsibility attendant to plaintiff's new position and comparable to Williams's assistant supervisorship, the *Palucki* court first found "*exceedingly* improbable" Palucki's claim that defendant "had transferred him to the new division hoping he would fail so that it would have a pretext for firing him." *Id.* at 1571. Second, the Seventh Circuit noted that plaintiff's argument that his employer took "too hard a view of his deficiency" was outweighed by the proposition that an "employee doesn't get to write his own job description." *Id.* The *Palucki* court continued as follows:

An employer can set whatever performance standards he wants, provided they are not a mask for discrimination on forbidden grounds such as race or age. He can set unrealistic standards and fire an employee for not being able to meet them; he can (as perhaps happened here) try to force a square peg into a round hole—and throw away a peg when it doesn't fit. . . . He can be as arbitrary as he wants—he just cannot treat an older employee more harshly than a younger one.

Id.; see also Bay, 936 F.2d at 118 (employee's dissatisfaction with new position following reorganization was legitimate reason for discharging plaintiff and replacing him with "someone not distracted by such dissatisfaction"); Meiri, 759 F.2d at 998 ("[Plaintiff] has offered no evidence suggesting that [her employer's] treatment of her differed from that accorded other non-Jewish employees; that [her employer] departed from its general policies in discharging her; or that non-Jewish persons on probation who acted similarly were retained."); Dister, 859 F.2d at 1116 ("Evidence that an employer made a poor business judgment in discharging an employee generally is insufficient to establish a genuine issue of fact as to the credibility of the employer's reasons.").

Based on the principles articulated above, this court finds that Brooklyn Union's reasons for discharging plaintiff—his refusal to accept responsibility for his actions by blaming others or by disparaging the importance of the complaint—are legitimate. Furthermore, Williams has provided neither direct evidence of pretext nor evidence that would dissuade a reasonable trier of fact from crediting the Company's proffered reasons. Accordingly, this court hereby grants defendant's motion for summary judgment as to plaintiff's age discrimination claim.[11] Because plaintiff has not set forth a prima facie case and defendant, in addition, has proffered sufficient non-discriminatory, non-pretextual reasons for terminating plaintiff's employment, this court finds no need to consider defendant's statute of limitations arguments.

### C. Plaintiff's Remaining State Law Claims

In addition to age discrimination claims, plaintiff's complaint alleges claims for wrongful discharge and intentional infliction of emotional distress. This court finds that defendant is entitled to summary judgment on both of these pendent state claims as well.

#### 1. Retaliatory Discharge

Plaintiff alleges that Brooklyn Union discharged him in retaliation for filing a workers' compensation claim stemming from a 1983 back injury. Section 120 of the Workers' Compensation Law of New York provides, in pertinent part:

It shall be unlawful for any employer . . . to discharge or in any other manner discriminate against an employee as to his or her employment because such employee has claimed or attempted to claim compensation from such employer, or because he or she has testified or is about to testify in a proceeding under this chapter and no other valid reason is shown to exist for such action by the employer.

Any complaint alleging such an unlawful discriminatory practice must be filed within two years of the commission of such practice.

N.Y.Work.Comp.Law § 120 (McKinney Supp.1993). In the event a discharged employee is dissatisfied with a decision of the Workers' Compensation Board regarding his complaint, his remedy is to appeal to the Board within thirty days after notice of the filing of an award or decision, for modification, rescission, or review of that decision. If the discharged employee is still dissatisfied after review, his remedy is then to appeal to the Appellate Division, Third Department, within thirty days of service of the decision. N.Y.Work.Comp.Law § 23 (McKinney 1965 & Supp.1993).

Where an employee has a remedy against his employer in proceedings under the Workers' Compensation Law, that remedy is exclusive. Burlew v. American Mutual

---

**11.** As the standards for age discrimination under New York Executive Law § 296 mirror those of the ADEA, see Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1186 (2d Cir.1992), plaintiff's state cause of action for age discrimination is likewise dismissed.

*Ins. Co.*, 63 N.Y.2d 412, 416, 482 N.Y.S.2d 720, 722, 472 N.E.2d 682, 684 (1984) ("[A]ll employer conduct that is regulated by the Workers' Compensation Law is subject to the protection of that law's exclusivity; if the employer violates any provision of the code, an employee's remedies cannot exceed those granted in the statutes."). As Section 120 provides a remedy to employees alleging retaliatory discharge, that section is exclusive and no cause of action for such a claim exists in the federal district court. Accordingly, defendant's motion for summary judgment as to plaintiff's retaliatory discharge claim is hereby granted.[12]

### 2. *Intentional Infliction of Emotional Distress*

 Defendant also is entitled to summary judgment on plaintiff's claim for intentional infliction of emotional distress because that claim is time-barred. New York applies a one-year statute of limitations to intentional torts which includes claims for intentional infliction of emotional distress. *Rosado v. New York*, 713 F.Supp. 124, 125 (S.D.N.Y.1989); N.Y.Civ.Prac.L. & R. § 215(3) (McKinney 1990). As the most re-

cent factual allegations in plaintiff's complaint arose in March of 1986 and as plaintiff did not file this action until September of 1988—over two years later—plaintiff's emotional distress claim is time-barred.[13]

### CONCLUSION

For all the reasons detailed above, defendant Brooklyn Union Gas Company's motion for summary judgment as to plaintiff's federal and pendent state claims is granted in its entirety. Plaintiff's motion to amend is hereby denied.

SO ORDERED.

---

**12.** Even if plaintiff's retaliatory discharge claim is interpreted as requesting this court to review the Board's earlier decision, his claim nevertheless must be dismissed because plaintiff failed to exhaust his administrative remedies, and this court therefore lacks subject matter jurisdiction over this cause of action. Williams filed a retaliatory discharge complaint with the Workers' Compensation Board in March of 1986. The Board dismissed his complaint, and Williams was notified of this decision in or about October of 1987. He failed to appeal to the Board within the requisite thirty days and therefore failed to exhaust his administrative remedies.

**13.** It is worth noting that plaintiff's claims fail on substantive grounds as well. First, in *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 294, 461 N.Y.S.2d 232, 235–36, 448 N.E.2d 86–89, 90 (1983), the New York Court of Appeals held that there is no common law cause of action for abusive discharge under New York law and that a plaintiff may not avoid that rule by alleging intentional infliction of emotional distress. The court explained:

> [I]n light of our holding above that there is now no cause of action in tort in New York for abusive or wrongful discharge of an at-will

employee, plaintiff should not be allowed to evade that conclusion or to subvert the traditional at-will contract rule by casting his cause of action in terms of a tort of intentional infliction of emotional distress. *Id.* at 303, 461 N.Y.S.2d at 236, 448 N.E.2d at 90; *see also Ingle v. Glamore Motor Sales, Inc.*, 73 N.Y.2d 183, 188–89, 538 N.Y.S.2d 771, 535 N.E.2d 1311 (1989). It would undermine this rule to allow Williams to assert that, by discharging him, Brooklyn Union intentionally caused him emotional distress.

With respect to plaintiff's claim that the Company humiliated and mistreated him during the interim period between his employment in reproduction and in the mailroom, plaintiff fails to allege facts sufficient to support his claim for intentional infliction of emotional distress. As the New York Court of Appeals held in *Fischer v. Maloney*, 43 N.Y.2d 553, 557, 402 N.Y.S.2d 991, 993, 373 N.E.2d 1215, 1217 (1978), in order to maintain such a claim, the plaintiff must show conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." Plaintiff's factual allegations, even if construed completely in his favor, fail to rise to this standard.